**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 14, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

JAMES DAHN,

     Plaintiff - Appellee,

v.

AUDREY AMEDEI, individually and in
her official capacity; AMANDA
CRAMER, individually and in her official
capacity,

     Defendants - Appellants,

and

ADOPTION ALLIANCE; MELANIE
TEM; VICKI LITTLE,

     Defendants.

No. 16-1059

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:13-CV-02504-RM-CBS)**
_____

Gillian Dale (Thomas J. Lyons, with her on the briefs), Hall & Evans, LLC, Denver,
Colorado, for Defendants-Appellants.

Mari Newman (Michael P. Fairhurst, with her on the briefs), Killmer, Lane & Newman,
LLP, Denver, Colorado, for Plaintiff-Appellee.
_____

Before **PHILLIPS** and **SEYMOUR**, Circuit Judges[*]

_____

**PHILLIPS**, Circuit Judge.

_____

When a state fails to protect a foster child from harm, the foster child can sue

the state under the special-relationship doctrine. The special-relationship doctrine

provides an exception to the general rule that states aren't liable for harm caused by

private actors. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189,

199–200 (1989). Under this doctrine, a state or its agents can be liable under 42

U.S.C. § 1983 for failing to protect people from harm if they have deprived those

people of liberty and made them completely dependent on the state for their basic

needs. But the special-relationship doctrine has limits—for instance, it requires

plaintiffs to show that the state assumed control over them, thus triggering a duty to

protect them.

This case is about the geographical reach of the special-relationship doctrine.

Specifically, the parties ask us to decide whether the special relationship—and its

accompanying duty to protect—crosses state lines. Here, a foster child, James Dahn,

sued two Colorado social workers responsible for investigating reports that he was

_____

[*] The Honorable Neil Gorsuch heard oral argument but did not participate in this opinion. The practice of this court permits the remaining two panel judges, if in agreement, to act as a quorum in resolving this appeal. *See* 28 U.S.C. § 46(d); *see also United States v. Wiles*, 106 F.3d 1516, 1516 n.* (10th Cir. 1997) (noting this court allows remaining panel judges to act as a quorum to resolve an appeal); *Murray v. Nat'l Broad. Co.*, 35 F.3d 45, 48 (2d Cir. 1994) (remaining two judges of original three-judge panel may decide petition for rehearing without third judge).

being abused, along with others involved with his adoption. Dahn had been in Oklahoma's custody until, with Oklahoma's approval, a Colorado-based private adoption agency placed him for adoption with a foster father in Colorado. The foster father physically abused Dahn before and after adopting him. The private adoption agency was responsible for monitoring Dahn's placement. Together with Colorado, it recommended approval of his adoption by the abusive foster father. Dahn eventually escaped his abusive foster father by fleeing his home.

Dahn then sued the private adoption agency (Adoption Alliance), its employees responsible for monitoring his placement, and the Colorado caseworkers who were assigned to investigate reports of abuse from officials at Dahn's public school. The district court dismissed all of Dahn's claims except a § 1983 claim against the two Colorado caseworkers and two state-law claims against Adoption Alliance and its employees. The district court concluded that the special-relationship doctrine allowed Dahn to move forward with the § 1983 claim, and it exercised supplemental jurisdiction over the remaining state-law claims. The Colorado caseworkers appealed. Though, accepting the facts alleged in the light most favorable to Dahn, we condemn their efforts to protect the vulnerable child, we conclude under the controlling precedents that the Colorado caseworkers are entitled to qualified immunity, and reverse.

3

# BACKGROUND[1]

## I.      Dahn's Placement, Abuse, and Adoption

Plaintiff James Dahn led a tragically difficult young life. When he was five years old, Oklahoma removed Dahn from his parents' custody for physically abusing him. For the next six years, he bounced from one foster home to another, living with a total of twelve different families. In 2007, Dahn was placed with a potential adoptive parent in Colorado. Adoption Alliance, a private, nonprofit adoption agency licensed by Colorado,[2] approved a match between Dahn and his prospective adoptive father, Jeremiah Lovato. In January 2008, Dahn, then thirteen years old, arrived in Colorado and Adoption Alliance delivered him to Mr. Lovato's physical custody. As the placing agency—and under a contract with Colorado—Adoption Alliance was responsible for ongoing monitoring to ensure that Dahn and Lovato made a good match before recommending that the district court in Moffat County, Colorado finalize the adoption.

---

[1] The facts below are taken from Dahn's Amended Complaint. Because we are reviewing the district court's dismissal of Dahn's complaint, we accept his well-pleaded factual allegations as true. *VR Acquisitions, LLC v. Wasatch Cty.*, 853 F.3d 1142, 1145 (10th Cir. 2017).

[2] Adoption Alliance contracted with Colorado to take on responsibilities related to adoption placement in interstate adoptions subject to the Interstate Compact on the Placement of Children, Colo. Rev. Stat. § 24-60-1801–03. Appellants' App. vol. IV at 949; sealed vol. at 179–200. Under this contract, Adoption Alliance committed itself to ensuring that "children who are placed across state lines for foster care or adoption receive adequate protection and support services." *Id.* vol. IV at 949.

Adoption Alliance hired independent contractor Vicki Little and assigned her to act as Dahn's caseworker and conduct in-home interviews with Dahn and Lovato. Another Adoption Alliance employee, Melanie Tem, supervised Little and reviewed her reports. Little was responsible for conducting monthly visits with Dahn and Lovato. But Lovato cancelled two scheduled visits in June and July 2008. In June, instead of meeting with Dahn and Lovato, Little spoke with Dahn on the phone, and in July she neither met with nor spoke to Dahn. So, in the first seven months, Little missed two of her seven required meetings with Dahn.

Despite Little's semi-regular visits, Adoption Alliance missed some very important details. Audrey Amedei and Amanda Cramer, employees of the Moffat County Department of Social Services ("the Department") responded to reports from Dahn's school of suspected abuse. On September 16, 2008, after missing the first two weeks of school, Dahn showed up with a fading black eye. He had also lost twenty-eight pounds in eight months (though Dahn was 5'1", his weight dropped from 138 pounds in January 2008 to 110 pounds in September 2008). Alarmed, school officials reported Dahn's black eye and weight loss to the Department. Amedei and Cramer responded to the report by interviewing Dahn at his school. They didn't photograph Dahn's black eye. For his part, Dahn denied that he had a black eye, and later complained to his school counselor about having to meet with Department employees. Six days later, Cramer and Amedei spoke with Lovato by telephone, and determined that the abuse report was unfounded and that no further action was necessary. But on September 24, 2008, the school again reported to the Department

that Dahn had suspicious bruising, this time on his arm. Cramer chose not to speak to Dahn or Lovato, but she did call Little to tell her about the reports of suspected abuse.

On September 28, a few days after the call from Cramer, Little met with Dahn at Lovato's house, but only spoke with Dahn alone for a few minutes. According to Little, Dahn didn't want to talk with her and tried to avoid answering her questions. Little later met with officials from Dahn's school, shrugging off the officials' concerns and telling them that Dahn was doing well. She also noted in her report that Lovato wanted to finalize the adoption quickly. On October 18, 2008, Little again visited Lovato's home to meet with him and Dahn. She didn't follow up on the previous months' concerns, and she didn't speak with Dahn alone. On November 22, at her next and final visit before the adoption, Little again failed to speak with Dahn alone. Five days later, in a home-study addendum to a Structured Analysis Family Evaluation, she recommended that Lovato be allowed to adopt Dahn.[3]

On December 1, 2008, just four days after defendants Little and Tem officially recommended Dahn's adoption, a Colorado police officer responded to yet another

_____

[3] In his Amended Complaint, Dahn alleges that "Defendant Adoption Alliance signed off on James Dahn's adoption in December 2008, fully aware of the information in Defendant Little's reports and in the reports from [Moffat County Department of Social Services]." Appellants' App. vol. III at 693. Adoption Alliance had this authority under its contract with Colorado, which provided that "upon receipt of a complete set of request packets for an adoptive placement from a Colorado sending agency or out-of-state [Interstate Compact on the Placement of Children] office, [Adoption Alliance] shall review the request packets and shall grant or deny permission for the placement to occur." *Id.* sealed vol. at 191.

report from school officials, this time concerning yet another bruise around Dahn's eye. The officer called Lovato, who yelled at the officer and wouldn't allow him to talk to Dahn. Because of Lovato's brusque response, the officer remained worried about Dahn, so he contacted Amedei and asked her why she hadn't responded to the school. Amedei became angry and defensive, and implied that the officer had no jurisdiction to investigate the case. Amedei didn't follow up with Lovato on the new information about suspected abuse, choosing to assume that if Lovato wouldn't speak to the police, then he wouldn't speak to Amedei either. Ten days after this incident, the Colorado court signed the adoption decree. Dahn claims that the defendants' disregard of warning signs of his abuse caused Oklahoma and Colorado to transfer legal custody from Oklahoma to Lovato.

About two months later, on February 27, 2009, the Department heard a fourth time from Dahn's school. This time, Dahn had missed six straight days of school. The School Resource Officer had gone to Lovato's house but found no one home. On March 3, four days after the report, Amedei and Cramer visited the Lovato home. Lovato answered the door and, as Cramer and Amedei had expected, he angrily refused to let them in for over an hour. Lovato claimed that he had agreed to only a phone interview, and was being "very disagreeable," as well as "defensive and uncooperative." Appellants' App. sealed vol. at 129–30. Lovato answered questions outside his house, requesting that Amedei and Cramer set up a meeting with Dahn's school to discuss the school's concerns, before finally permitting the two social workers to go into the house and see Dahn. When they finally got into the house, they

7

spoke to Dahn only momentarily, saw him only from the neck up, and never saw him alone. In their report of this visit, Cramer and Amedei noted that Dahn avoided eye contact and was evasive in conversation.

Soon after this, Lovato cancelled the March 6, 2009 meeting with Dahn's school and then withdrew him from school, opting for home-schooling. Amedei and Cramer knew that home-schooling would isolate Dahn and Lovato from observation. Amedei noted that Dahn's home-schooling meant that the Department would likely be unable to maintain contact with Dahn. But Amedei and Cramer expressed no concern about this, because they had concluded that all the reports of suspected abuse, including the most recent report, were unfounded.

But they were wrong. Lovato had been physically abusing Dahn since September 2008. The beatings had escalated until Dahn protected himself by running away. On January 3, 2010, at age fifteen, Dahn fled from Lovato and told another young boy about Lovato's continued physical abuse.[4] He was taken immediately to the hospital for treatment of his injuries. Lovato had broken Dahn's arm months earlier and had continued beating him up through the weekend before he fled, leaving bruises on his back, face, ear, head, and buttocks. The beating had left severe internal

---

[4] The record does not reveal how long the abuse had been going on. The caseworker—not Amedei or Cramer—who interviewed Dahn after he fled Lovato wrote in her report that "James stated that he has been with his adoptive father for two years. The abuse started in October. Prior to that father only used the belt on him." Appellants' App. sealed vol. at 170. But Dahn had appeared at school with bruises on his face and arms in September 2008, so the abuse began earlier than October 2009.

injuries and bleeding, as well as open lesions on Dahn's buttocks which were still bleeding when he arrived at the hospital. Lovato was tried and convicted of criminal child abuse in Colorado state court, and was sentenced to 119 ½-years-to-life in prison.

## II.     District-Court Proceedings

In September 2013, Dahn sued Adoption Alliance, Little, Tem, Amedei, and Cramer for his injuries. In an Amended Complaint, Dahn alleged three claims under § 1983: (1) that all defendants violated his Fourteenth Amendment substantive-due-process rights, under a special-relationship theory, (2) that all defendants violated his Fourteenth Amendment substantive-due-process rights, under a state-created-danger theory, and (3) that defendants Adoption Alliance, Tem, and Amedei failed to properly train and supervise their employees in evaluating, monitoring, and investigating the prospective adoptive placement for abuse, resulting in violations of Dahn's Fourteenth Amendment substantive-due-process rights. Dahn also brought state-law claims for negligence and outrageous conduct against all defendants.

On February 17, 2015, Amedei and Cramer filed a renewed Motion to Dismiss[5] the Amended Complaint, asserting qualified immunity and denying a special relationship with Dahn. The other defendants also renewed their motions to

---

[5] After a magistrate judge recommended dismissal of all of Dahn's claims in response to Defendants' motions to dismiss his initial Complaint, Dahn amended his Complaint and mooted the magistrate judge's recommendation.

dismiss. The magistrate judge recommended, for a second time, that the district court dismiss all federal claims.

The district court partly granted, and partly denied, the motions to dismiss. *Dahn v. Adoption All.*, 164 F. Supp. 3d 1294, 1321–22 (D. Colo. 2016). The sole surviving claims were Dahn's substantive-due-process claim based on his alleged special relationship with Colorado officials (Amedei and Cramer), and his state-law claims against Adoption Alliance, Little, and Tem. *Id.* The district court concluded that Dahn had alleged sufficient facts to show that he had a special relationship with Amedei and Cramer and that they had violated his Fourteenth Amendment substantive-due-process rights. *Id.* at 1312–13. At this early stage in the litigation, the district court also declined to award Amedei and Cramer qualified immunity. *Id.* Defendants Amedei and Cramer appealed that decision.[6]

Here, we must decide whether the district court erred by not granting qualified immunity to Amedei and Cramer on their motion to dismiss Dahn's § 1983 claims. Specifically, we examine whether the district court erred in concluding that these two Defendants had a special custodial relationship with Dahn, and whether the law on this issue was clearly established.

---

[6] The one issue before us in this interlocutory appeal is whether the district court should have granted Amedei and Cramer qualified immunity. So we do not address Dahn's other claims, nor do we address the district court's conclusion that Defendants Little and Tem faced no § 1983 liability because they weren't acting under the color of state law.

## ANALYSIS

### I.      Standard of Review

We "review[] de novo the denial of a motion to dismiss based on qualified immunity." *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012). In doing so, we must determine whether the Amended Complaint's specific allegations plausibly support a claim for relief. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 n.2 (10th Cir. 2007). The Amended Complaint's factual allegations must raise a right to relief beyond mere speculation. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In conducting our review, "[w]e assume the truth of all well-pleaded facts in the complaint, and draw all reasonable inferences therefrom in the light most favorable to the plaintiffs." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009). "But we need not accept legal conclusions contained in the complaint as true." *Estate of Lockett ex rel. Lockett v. Fallin*, 841 F.3d 1098, 1107 (10th Cir. 2016).

We apply a special standard of review when defendants assert a qualified-immunity defense. *See Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011) (describing the standard of review in the context of a motion for summary judgment). In such cases, the burden shifts to the plaintiff to allege facts sufficient to show (1) that the defendant violated a constitutional or statutory right (2) that was clearly established at the time of the conduct in question. *Id.* We can decide which prong to address first, and need not address both. *Estate of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017). To survive a motion to dismiss, Dahn must

11

"nudge[] [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. To do so, he "must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated [his] constitutional rights, and that those rights were clearly established at the time." *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008).

## II.    Substantive-Due-Process Claim: Special Relationship

Dahn's first § 1983 claim against Amedei and Cramer, and the only federal claim on appeal, is that the Colorado caseworkers violated his Fourteenth Amendment due-process right "not to be deprived of his liberty without due process of law, which encompassed his right to be reasonably safe from harm in foster care." Appellants' App. vol. II at 330. "The Due Process Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.'" *Schwartz*, 702 F.3d at 579 (quoting U.S. Const. amend. XIV) (alterations in original). "Section 1983 provides a private cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Id.* (quoting 42 U.S.C. § 1983). Though state actors generally aren't liable for private acts of violence, an exception exists when the state has a special relationship with the injured person. *See DeShaney*, 489 U.S. at 198–200.

Due-process claims built on the special-relationship doctrine have four elements. First, the plaintiff must demonstrate the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs. *DeAnzona v. City & Cty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000).

12

Second, the plaintiff must show that the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger. *Schwartz*, 702 F.3d at 583. Third, the plaintiff must show that the defendant's conduct caused the plaintiff's injuries. *Id.* And finally, fourth, the defendant's actions must shock the conscience. *Id.*

The existence of the special relationship is the pivotal issue: if none exists, a state cannot be held liable for a person's injuries at the hands of a private third party as opposed to a state actor. "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual . . . ." *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995). "Generally, the scope of this relationship has turned on the dependent and involuntary nature of the custodial relationship between the individual and the State." *Schwartz*, 702 F.3d at 580. Plaintiffs must show that the state has restrained them against their will, because "if there is no custodial relationship there can be no constitutional duty." *DeAnzona*, 222 F.3d at 1234. And the state has a special custodial relationship only with "individuals [who] depend *completely* on the state to satisfy their basic human needs." *Maldonado v. Josey*, 975 F.2d 727, 733 (10th Cir. 1992) (emphasis added).

"As our case law makes clear, the special relationship exists between the State and foster child, which triggers an accompanying, continuing duty imposed on state custodial officials thereafter—not a duty limited to only the specific officials who executed the placement of the child." *Schwartz,* 702 F.3d at 581 (footnote omitted).

13

When state actors "knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown," they have violated the foster child's constitutional rights. *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 890 (10th Cir. 1992). The question here is whether a foster child in the custody of one state can, after being placed by a private adoption agency with a foster father in a different state, establish a special custodial relationship with that second state when the second state takes on the duties to investigate evidence suggesting abuse.

## III.   No Clearly Established Special Relationship[7]

We decide here only whether Dahn can show that his special relationship with Amedei and Cramer was clearly established under existing law. "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood'" the contours of the right. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)). "We do not require a case directly on point, but existing precedent must have placed the statutory

---

[7] We note the importance of Dahn's adoption date. On December 11, 2008, Oklahoma, Colorado, and Adoption Alliance finalized Lovato's adoption of Dahn. This meant that after December 11, no state—neither Colorado nor Oklahoma—had custody of Dahn. This, in turn, affects the special-relationship claim, because after his adoption, Dahn was not completely dependent on any state to satisfy his basic human needs. Rather, after this time, Dahn was completely dependent on Lovato to satisfy his basic human needs. We need not address Amedei and Cramer's post-adoption constitutional liability because we conclude that Dahn can't show clearly established law that he had a special relationship with Amedei and Cramer even before he was adopted.

or constitutional question beyond debate." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court has warned us "not to define clearly established law at a high level of generality." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). We must instead ask "whether the violative nature of *particular* conduct is clearly established." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). And we must do so "in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

Here, the district court concluded that Dahn had alleged sufficient facts to show that he had a special relationship with Amedei and Cramer, and that the law on this point was clearly established.

> [C]ase law . . . shows that the determination as to who has "custody" for purposes of the special relationship doctrine turns not only on legal formalities and the documentation surrounding the ward's foster care, but rather what type of actual, literal control state actors exercised over the ward and what steps those state actors took to supervise the ward's safety.

*Dahn*, 164 F. Supp. 3d at 1311. It also concluded that "the Tenth Circuit has clearly established the constitutional right that Plaintiff claims was violated by Amedei and Cramer, and that such right was clearly established as early as 1985." *Id.* at 1319.

Defendants Amedei and Cramer take issue with the district court's conclusion on this threshold issue. Had Dahn suffered the same abuse at the hands of his natural parents, Amedei and Cramer would not be liable. *See DeShaney*, 489 U.S. at 201–03 (holding that state social-services workers weren't liable to the abused child whose case they were investigating because the state did nothing to assume control over the

15

child and the child was in the custody of his natural parents). "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200. Dahn urges us to hold instead that under *Schwartz*, he had a special relationship with the state.

We do not resolve whether Dahn established a special relationship with Amedei and Cramer; we address only whether that relationship was clearly established under existing precedent. Even if Dahn had a special custodial relationship with Amedei and Cramer—employees of Colorado—*Schwartz* doesn't clearly establish this relationship based on our facts. Here, Dahn was in Oklahoma's custody up until his adoption. The district court extended *Schwartz* in finding that Dahn sufficiently alleged a special relationship with Amedei and Cramer.[8] Whether or not he was correct to do so, the law up to that point did not clearly establish the requisite special relationship.

In *Schwartz*, a young foster child, Chandler, died at the hands of his abusive foster family. 702 F.3d at 576–77. Chandler's biological parents alleged under § 1983 that employees of the Denver County Department of Human Services (DCDHS) violated, among other laws, Chandler's Fourteenth Amendment substantive-due-

---

[8] Because we conclude under the facts of this case that clearly established law did not create a special relationship between Dahn and the caseworkers, we need not and do not address the remaining factors of his claim. For this reason, we do not comment on whether Amedei and Cramer violated Dahn's constitutional rights under the Fourteenth Amendment's Due Process Clause by failing to exercise their professional judgment.

16

process rights. *Id.* at 576. The employees claimed that they had no special relationship with Chandler because a different county had placed him in foster care. *Id.* at 581. We concluded that the special-relationship doctrine extends beyond the employees in the county that initially placed a child in foster care and reaches county employees actually exercising custody over the child. *Id.* at 581, 584–85. We noted that "the legal framework for [the special relationship] doctrine does not support limiting the scope of the special relationship doctrine to only those individuals involved in a child's initial placement" because foster children are "entitled to more considerate treatment and conditions" than others under state control such as incarcerated criminals, and because it "would lead to untenable results." *Id.* at 582–83 (quoting *Yvonne L.*, 959 F.2d at 890).

We also noted that even though the Jefferson County Department of Human Services (JCDHS) initially placed Chandler into foster care, its doing so made him dependent on the state for his basic human needs, not just that one department. *Id.* at 584 ("As a foster child, Chandler relied upon the State and its county departments, via its placement of him in a foster home, for his basic human needs." (footnote omitted)). So we concluded that "DCDHS accepted responsibility for Chandler by investigating responses to alleged abuse" and placing him back in his foster father's care after JCDHS had declined to investigate "on the basis that the foster family resided in Denver County." *Id.* at 585. We also noted that "[defendants] were aware of Chandler's circumstances and were the custodial officials responsible for

17

overseeing Chandler's foster care case." *Id.* Therefore, Chandler had a special custodial relationship with DCDHS.

Here, Dahn asks us to affirm the district court's extension of *Schwartz* to his claim and hold that even though Oklahoma placed him in foster care and Adoption Alliance monitored his placement, Colorado exercised custody over him because he lived there and because Colorado employees investigated his school's suspected-abuse reports. Dahn claims that in *Schwartz*, we held that "the social workers based in the county where a foster child lives and attends school, who accept responsibility to investigate alleged abuse of that child, have a custodial relationship with the child." Appellee's Response Br. at 9. He notes that Amedei and Cramer were "*the* state-based caseworkers assigned to his case while he was a foster child and ward of the State, and lived and attended school in" the county where Amedei and Cramer worked. *Id.* at 3. And he claims that Amedei and Cramer can't avoid liability because they "repeatedly chose to *accept responsibility* for investigating allegations that James was being abused, and *never* claimed the State of Oklahoma was exclusively responsible for protecting James' safety during the entire time they were assigned to his case." *Id.*

We need not go so far, because the second prong of the qualified-immunity analysis determines the outcome of this case. *Schwartz* is the closest case to ours, but no court has extended it so far. In certain circumstances, it would be reasonable and even logical to extend the special-relationship doctrine across state lines as well as county lines, as in *Schwartz*, but our case law doesn't clearly establish this extension.

18

In *Schwartz*, our analysis was limited to whether the special relationship extended both temporally and geographically beyond the initial placement. In other words, we were deciding whether a foster child placed into foster care by one county also has a special, custodial relationship with his new county. But there, all counties were entities of a single state, and each operated its own DHS department under the overarching state social-services organization. *Schwartz*, 702 at 584 n.13. And the special relationship is triggered by the *state* assuming control over a foster child, not a particular county. *Id.* at 584–85. The state's assumption of control creates an "involuntary, custodial relationship with the State [that] imposes a continuing constitutional duty on state custodial officials to safeguard individuals in the State's care." *Id.* at 585. The doctrine extends to *all* state-custodial officials, but it does not clearly extend beyond the state's boundaries.

Here, Oklahoma and Colorado are two separate sovereigns. So, Amedei and Cramer argue, it is not enough that Dahn was a ward of *a* state. To overcome qualified immunity and survive their motion to dismiss, Dahn had to allege sufficient facts to show that he had a special relationship with the state whose employees he alleged knew of the danger to him or failed to exercise professional judgment. We can't deem it clearly established under *Schwartz* that a state employee's investigating

19

reports of abuse of a child is enough to create a special custodial relationship with that child.[9]

Indeed, the Supreme Court has placed limits on the special-relationship doctrine. In *DeShaney*, the Court explicitly declined to find a special relationship where Department of Social Services employees investigated reports of a biological father's abuse of his young child. 489 U.S. at 203. The Court noted that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf." *Id.* at 200. Because the state had not deprived the child of his liberty, it did not have a custodial relationship with him that required the state to protect him from harm. *Id.* at 202–03. Therefore, the Court held that the state could not be liable to the child for failing to prevent his father from beating him. *Id.* Though *DeShaney* is factually distinct from Dahn's case, it illustrates that the Supreme Court is wary of finding a special relationship whenever a social worker responds to child-abuse reports. So *DeShaney* supports the conclusion that the law doesn't clearly permit extending the special-relationship doctrine to Dahn's circumstances—at least not yet.

---

[9] Dahn argues that we must accept as true his allegation that "Colorado was the state 'principally responsible for James Dahn's protection and support services.'" Appellee's Response Br. at 15 & n.6 (quoting Appellants' App. vol. III at 674). But which state was "principally responsible for" Dahn is a legal conclusion rather than a factual allegation, and we need not accept legal conclusions in a plaintiff's complaint. *See Lockett*, 841 F.3d at 1107.

In sum, the special-relationship doctrine extends beyond just those actors who placed Dahn in Lovato's custody; it includes all state officials in the state with whom he had a special relationship. But, for now, the law doesn't clearly extend constitutional liability under the special-relationship doctrine to employees of a state that didn't deprive Dahn of his liberty or supply his basic needs, even though they were social workers in the county where he resided. *See Schwartz*, 702 F.3d at 583 ("The special relationship between the State and the foster child is a necessary predicate to imposition of liability under this doctrine . . . .").

We note, however, that Amedei and Cramer owed *some* duty to Dahn, and this duty might very well expose them to tort liability. Not only did the Department owe a legal duty to Dahn as a child living in Moffat County, but Amedei and Cramer responded to Dahn's school's reports of suspected abuse. *See DeShaney*, 489 U.S. at 201–02 ("It may well be that, by voluntarily undertaking to protect [a child] against a danger it concededly played no part in creating, the State acquired a duty under state tort law to provide him with adequate protection against that danger."). In investigating but failing to take any action to remove Dahn from Lovato's custody, Amedei and Cramer may have abdicated their legal duty to protect Dahn from further danger which they knew or should have known of.[10] Amedei and Cramer could

---

[10] Unfortunately for Dahn, the district court dismissed his negligence and outrageous-conduct claims against Amedei and Cramer under the Colorado Governmental Immunity Act, Colo. Rev. Stat. § 24-10-110(5)(a), (b). Under that law, courts must dismiss claims against state officials unless the plaintiff alleges that the

21

have—and should have—done more to investigate Dahn's abuse. But as the Supreme Court said in *DeShaney*, "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *Id.* So whatever duty Amedei and Cramer owed Dahn didn't necessarily implicate § 1983. *See id.* at 201–02.

Dahn complicates his argument by pointing to the Interstate Compact on the Placement of Children ("ICPC"). He reminds us that the ICPC requires states to work together to care for foster children who are placed across borders. Though his argument—that this law might establish a foster child's special relationship with both the sending and the receiving state—is well-reasoned and logical, we can't say that this legal position is clearly established. Under Article V(a) of the ICPC, "[t]he sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have had if the child had remained in the sending agency's state, until the child is adopted . . . ." Colo. Rev. Stat. § 24-60-1802. Though the ICPC goes on to permit a sending agency to contract with a public or private agency in the receiving state to perform services related to the foster child's case, *see id.*, Dahn doesn't sufficiently allege that Oklahoma entered into such an agreement. He says only that either Colorado (and perhaps Oklahoma as well) contracted with Adoption

official's actions were willful and wanton and pleads sufficient facts to support that allegation. *Id.*

22

Alliance to monitor Dahn after his move to Colorado.[11] Moreover, even if he had sufficiently alleged his claim, it still wouldn't mean that the law on this issue was clearly established such that all reasonable social-services employees in a receiving state would know that they could be constitutionally liable to a foster child who was still technically in the sending state's custody.

"Qualified immunity protects governmental officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schwartz*, 702 F.3d at 579 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To be clearly established, the law must be so clear that it would put every reasonable official on notice that certain conduct violates a constitutional right. *See al-Kidd*, 563 U.S. at 741. *Schwartz* would not notify Amedei and Cramer that their failure to protect Dahn under the factual circumstances of this case would violate Dahn's Fourteenth Amendment substantive-due-process rights under the special-relationship doctrine. Thus, even accepting all of Dahn's factual allegations as true, Dahn presents no clearly established law creating a special, custodial relationship between

---

[11] The involvement of the private non-profit Adoption Alliance and its employees further complicates Dahn's argument that he had a clearly established special custodial relationship with Colorado. Dahn wasn't dependent solely on Colorado for his basic needs. Rather, he was in Oklahoma's custody up until the moment that state allowed him to be placed in Lovato's custody, and Adoption Alliance employees were monitoring his placement with Lovato. And the record includes Colorado's contract with Adoption Alliance, but Dahn claims that the non-profit may have also had a contract in place with Oklahoma.

23

him and Colorado or its employees, and therefore the district court should have awarded Amedei and Cramer qualified immunity on Dahn's special-relationship claims against them.[12]

## CONCLUSION

For the reasons stated above, we REVERSE the district court's order denying Amedei and Cramer's motion to dismiss Dahn's special-relationship claim against them, and REMAND for further proceedings consistent with this case. We also DENY Amedei and Cramer's Stipulated Motion to Dismiss Appeal, and DISMISS their Motion to Withdraw Stipulated Motion to Dismiss Appeal as moot.

---

[12] Because we conclude, based on this case's facts, that Dahn has failed to show clearly established law creating a special relationship between him, Amedei and Cramer, we decline to address whether the special-relationship doctrine could ever cross state borders. We also decline to address the other element of such claims, which is whether Amedei and Cramer acted in an unprofessional and conscience-shocking manner.