**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 28, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

T.D.,

    Plaintiff - Appellee,

v.

KELCEY PATTON,

    Defendant - Appellant,

and

THE DENVER DEPARTMENT OF
HUMAN SERVICES,

    Defendant.

No. 16-1092

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:14-CV-01568-RM-MJW)**
_____

Andrew D. Ringel (Gillian Dale, with him on the briefs), Hall & Evans, LLC., Denver, Colorado, appearing for Appellant.

Jordan Factor, Allen & Vellone, P.C., Denver, Colorado, appearing for Appellee.
_____

Before **BRISCOE**, **EBEL**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.

_____

T.D. sued Kelcey Patton under 42 U.S.C. § 1983 for violating his right to substantive due process.  He relies on a "danger-creation theory," which provides that "state officials can be liable for the acts of third parties where those officials created the danger that caused the harm."  *Currier v. Doran*, 242 F.3d 905, 917 (10th Cir. 2001) (quotations omitted).[1]

Ms. Patton, a social worker for the Denver Department of Human Services ("DDHS"), was one of those responsible for removing T.D., a minor at the time, from his mother's home, placing him into DDHS's custody, and recommending T.D. be placed and remain in the temporary custody of his father, Tiercel Duerson.  T.D. eventually was removed from his father's home after DDHS received reports that T.D. had sexual contact with his half-brother, also Mr. Duerson's son.  DDHS later determined that during T.D.'s placement with Mr. Duerson, T.D. had suffered severe physical and sexual abuse at the hands of his father.

Ms. Patton moved for summary judgment on the ground that she is entitled to qualified immunity.  The district court denied the motion.  This interlocutory appeal followed.[2]  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.  Viewing the facts

---

[1] This action was originally brought by T.D.'s mother, Regina Garcia.  T.D. was added as a plaintiff when he turned 18.  Ms. Garcia has since been dismissed as a plaintiff.  T.D. is therefore the only Plaintiff-Appellee in this case.

The action was originally brought against both Ms. Patton and the Denver Department of Human Services ("DDHS").  The district court granted summary judgment to DDHS.  T.D. does not appeal that order, so Ms. Patton is the only Defendant-Appellant in this case.

[2] T.D. asserted two theories of liability under the Fourteenth Amendment against Ms. Patton:  a "danger-creation" theory, discussed above, and a "special

in the light most favorable to T.D., we conclude that, under *Currier*, Ms. Patton violated

T.D.'s clearly established substantive due process constitutional right to be free of a state

official's creation of danger from a private actor.

We agree with the district court that Ms. Patton violated T.D.'s substantive due

process right by knowingly placing T.D. in a position of danger and knowingly

increasing T.D.'s vulnerability to danger.[3]  She recommended to the juvenile court

that T.D. be placed and remain in Mr. Duerson's temporary custody despite her

admitted concerns about T.D.'s safety in the home, her knowledge of Mr. Duerson's

criminal history that included a conviction for attempted sexual assault against a

minor in his care, and notice of evidence that Mr. Duerson was potentially abusing

T.D.  She failed to inform the juvenile court about her concerns and knowledge of

Mr. Duerson's criminal history and made her affirmative recommendations out of

fear of being fired.

She also failed to investigate whether Mr. Duerson was abusing T.D. despite

her awareness of evidence of potential abuse.  This evidence included T.D.'s report

relationship" theory.  The special-relationship theory allows state officials to be held liable "for the acts of private parties when the state has assumed a special relationship with and control over an individual." *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013).

The parties litigated both theories in district court.  The court granted summary judgment on the special-relationship theory, but denied summary judgment on the danger-creation theory.  Ms. Patton appeals only the unfavorable ruling against her, so this appeal is limited to the § 1983 claim based on the danger-creation theory.

[3] Ms. Patton does not contest the court's determination that T.D. can show a constitutional violation, but instead focuses her arguments on whether she violated clearly established law.  We nonetheless analyze the constitutional violation for reasons explained below.

that Mr. Duerson had hit him with a wooden mop handle and school officials' reports that T.D. was spending significant time in the nurse's office complaining of body aches and appearing fearful of his father. In the face of this information, she recommended to the juvenile court that T.D. remain with his father. Ms. Patton acted recklessly and in conscious disregard of a known and substantial risk that T.D. would suffer serious, immediate, and proximate harm in his father's home. Her conduct, taken as a whole, shocks the conscience and thus amounts to a substantive due process violation under the Fourteenth Amendment.

Based on the facts and legal determination in this court's *Currier* decision, a reasonable official in Ms. Patton's shoes would have understood she was violating T.D.'s constitutional rights. In both *Currier* and here, county social workers removed children from their mothers' homes and placed them in their fathers' homes, where the children were abused. The social workers in both cases failed to alert the juvenile court of relevant facts undermining the fathers' fitness as caretakers and recommended that the fathers assume custody of the children—despite being on notice that the fathers' homes were places of danger. And, in both cases, the social workers failed to investigate whether the fathers were abusing their children, despite being on notice of evidence suggesting abuse. Ms. Patton's conduct sufficiently resembles the conduct we held unconstitutional in *Currier* such that a reasonable official in her position would have known that her actions violated T.D.'s clearly established right. She was therefore not entitled to qualified immunity.

- 4 -

## I.  BACKGROUND

### A. *Factual Background*

The following facts are presented in the light most favorable to T.D., the

nonmoving party on the request for summary judgment on the danger-creation claim.[4]

*See Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016).[5]

---

[4] T.D. asserts that we lack jurisdiction over this appeal because Ms. Patton's arguments require us to rely on facts taken in her favor, rather than in T.D.'s favor. We disagree.

Ms. Patton acknowledges that we must take the facts in the light most favorable to T.D.  She states that she does not ask us to review the district court's presentation of the facts, but instead to "focus[] solely on whether the facts as determined by the District Court demonstrate a clearly established violation of T.D.'s constitutional rights."  Aplt. Br. at 3.  We have jurisdiction over that legal question on interlocutory appeal based on the facts determined by the district court and taken in the light most favorable to the nonmoving party, here T.D.  *Henderson v. Glanz*, 813 F.3d 938, 947-48 (10th Cir. 2015).  We may not and do not, however, second guess the district court's determinations of evidence sufficiency.  *Id.* at 948.

[5] The facts come from the district court's order.  We also present a few facts—such as dates of hearing reports and statements in documents submitted to the juvenile court—not explicitly presented in the court's order, but from documents the court considered and that are consistent with the court's factual presentation.  *See Johnson v. Jones*, 515 U.S. 304, 319 (1995) (providing that an appellate court may review the record to determine what facts the district court likely assumed when the district court did not state those facts); *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1152-53 (10th Cir. 2010) (stating that the "universe of facts" for appellate review of a denial of summary judgment are those facts "explicitly found by the district court, combined with those facts that it likely assumed"); *see also DiLuzio v. Village of Yorkville, Ohio*, 796 F.3d 604, 611 (6th Cir. 2015) (discussing how it was appropriate to consider facts that are not stated in the district court's record, but that may bolster the court's determination).  The facts presented do not question the court's determinations of evidence sufficiency.  *Henderson*, 813 F.3d at 948.

1. **T.D.'s Removal from his Mother's Home**

T.D. is the son of Regina Garcia and Tiercel Duerson, who are separated.  The family has a troubled past, with the parents having been referred to DDHS for intra-familial neglect, lack of supervision, and intra-familial sexual abuse.

In November 2009, T.D. turned 14 and was living with his mother, Ms. Garcia. On November 2, 2009, DDHS was notified that T.D. had not been in school, which served as a diversion program for criminal charges, since mid-October.  DDHS also learned that his medications had not been refilled and he had not participated in his mandated therapy.  After T.D. did not return to school, a DDHS social worker visited Ms. Garcia's home and discovered the home in disarray, with animal feces, cigarette butts, and piles of dirty clothes on the floor.  The social worker gave Ms. Garcia a list of tasks to accomplish, including sending T.D. back to his diversion program.

On December 15, 2009, DDHS was informed T.D. had been kicked out of his diversion program for noncompliance and truancy.  On January 4, 2010, DDHS received another report that T.D.'s violent behavior was escalating at school and at home.  For instance, T.D. had reportedly stabbed his sister with a fork and had threatened to commit suicide.

In early April 2010, T.D. was removed from his mother's home and placed at the "Family Crisis Center."

2. **DDHS's Petition for Dependency or Neglect**

On April 9, 2010, DDHS filed a "Petition in Dependency or Neglect" for T.D. and his sister in juvenile court based on DDHS's concerns that Ms. Garcia was

unable to care for her children.  Ms. Patton was the DDHS case worker on the Petition, and Lisa Gomez was appointed as T.D.'s guardian ad litem.

On May 12, 2010, the juvenile court held a hearing on the Petition.  Ms. Patton prepared a report for the hearing, signed by her supervisor, Senait Ketema.  In the report, Ms. Patton determined the family's risk assessment score was 11—signaling a high level of risk—and that the children were unsafe.[6]  Ms. Patton mentioned in the report that Mr. Duerson had been incarcerated for two years for attempted sexual assault on a minor and that Ms. Garcia had taken out a restraining order against him to keep Mr. Duerson away from her family.  Ms. Patton recommended that T.D. remain in the custody of DDHS for purposes of placement.

At the hearing, the juvenile court explored options for T.D.'s placement.  The court ordered DDHS to obtain a parental risk assessment of Mr. Duerson under the applicable Colorado Sex Offender Management Board ("SOMB") standards to determine his likelihood of re-committing sex offenses, an important factor to

---

[6] DDHS reached these conclusions based on:  T.D.'s family history of sexual abuse and multiple child protection referrals; T.D.'s need for mental health treatment; Ms. Garcia's inability to control him; T.D.'s anger issues and enuresis (involuntary urination); Mr. Duerson's conviction for sexual abuse of a minor and his registration as a sex offender; Ms. Garcia's restraining order against Mr. Duerson; the fact that Ms. Garcia's children were all on individualized education programs; Ms. Garcia's disheveled home that smelled of urine; and Ms. Garcia's need for help in disciplining her children and making them follow house rules.

evaluate whether T.D. should be placed with his father.  Ms. Patton was responsible

for arranging Mr. Duerson's risk assessment, but failed to do so.[7]

### 3.  **T.D.'s Placement in Shiloh House**

On May 25, 2010, the juvenile court ordered DDHS to place T.D. in "Shiloh

House," a residential child care facility where T.D. could live, receive treatment, and

go to school.

On July 30, 2010, the juvenile court held a permanency planning hearing—one

of several that would happen every few months to determine T.D.'s placement and

custody status.  At this hearing, a family therapist reported that Mr. Duerson was

making "great progress" in his therapy with T.D.  The therapist also relayed Mr.

Duerson's request that T.D. be placed in his care after T.D. was discharged from

Shiloh House.

### 4.  **Ms. Patton's Review of Mr. Duerson's Criminal History**

Before the next juvenile court hearing, Ms. Patton reviewed Mr. Duerson's

criminal history, which revealed:

- In 2005, Mr. Duerson was convicted and sentenced to two years in prison for attempted sexual assault of a minor, P.G., his step-child living in his care at the time of the offense.  Mr. Duerson was a registered sex offender for that conviction.

- In 2005, Mr. Duerson violated a restraining order by attempting to contact P.G.

- In November 2007, Mr. Duerson violated probation.  His probation was revoked because he had "purposefully failed" to complete his

---

[7] Although the parties dispute whether Ms. Patton failed to arrange for his risk assessment, the facts viewed favorably to T.D. support that she failed to do so.

sex offender treatment obligations had "been deceptive in disclosing his relationship with his current girlfriend," and had "purposefully violated his no contact contract with his girlfriend, while missing treatment appointments." Dist. Ct. Order at 9 (quotations omitted). The probation report documenting the violation stated that he was not amenable to treatment and was unwilling to comply with his probation conditions.

- Mr. Duerson was charged, but not convicted, for other offenses, including misdemeanor assault, misdemeanor wrongs to minors, misdemeanor domestic violence, and misdemeanor resisting police authority.

- Apart from his 2005 conviction, there had been "multiple other incidents" involving Mr. Duerson abusing P.G., including an incident when Mr. Duerson dragged P.G. into a bedroom and grabbed her butt. *Id.*

As part of her investigation, Ms. Patton also reviewed what the parties call the "Trails Report," a document in the DDHS's system prepared in 2005 by a DDHS social worker. The report detailed that Mr. Duerson's 2005 conviction was based on his attempt to sodomize P.G. against her will.

Based on her investigation, Ms. Patton's "gut [did not] feel good" about, and she questioned, placing T.D. with Mr. Duerson. *Id.* at 10.

5. **The August 17, 2010 Hearing**

On August 17, 2010, before the next juvenile court hearing, Ms. Patton, T.D., Briana Hutchinson (an outside family therapist), Kyle Hommes (T.D.'s clinician at Shiloh House), and Mr. Duerson met to discuss T.D.'s custody. The attendees agreed T.D. was ready to transition from Shiloh House to a lower level of care. Mr. Duerson reported that he had successfully completed his offense-specific therapy and that he was no longer on probation.

The meeting participants approved a tentative plan—subject to Ms. Gomez's approval—to transition T.D. from Shiloh House to Mr. Duerson's home. The participants agreed to gradually increase the visits between T.D. and Mr. Duerson, under the supervision of Mr. Duerson's wife.

Ms. Patton misrepresented her knowledge of Mr. Duerson's criminal history to the meeting participants. She also failed to share with the meeting participants the full extent of her concerns about T.D.'s placement with his father, including that Mr. Duerson was not taking his sex offense treatment seriously.[8]

6. **The September 7, 2010 Hearing**

On September 7, 2010, the juvenile court held another permanency planning hearing.

---

[8] It is disputed to what extent Ms. Patton misrepresented her knowledge or failed to share her concerns with the meeting participants, but we must view the facts in T.D.'s favor.

*a. Report for the Hearing*

Before the September 7, 2010 hearing, Ms. Patton submitted a report to the juvenile court. It recounted how the participants at the August 17, 2010 meeting agreed T.D. was ready to transition to a lower level of care and that the family therapist believed it was in T.D.'s best interest to return to Mr. Duerson's home. The report also stated that Mr. Duerson believed he was better equipped to address T.D.'s special needs and that Mr. Duerson had completed his offense-specific therapy and was no longer on probation.

Although Ms. Patton had informed the juvenile court that Mr. Duerson had been convicted of a sexual offense against a minor in 2005 and was later put on probation for that offense, she did not include all of her particular knowledge about that conviction or other facts about Mr. Duerson's criminal history in the final September 7, 2010 report. In the final report, Ms. Patton did not attach Mr. Duerson's criminal history or the Trails Report, which provided details of Mr. Duerson's 2005 conviction. Nor did she inform the court that his probation was revoked due to his purposeful failure to fulfill his sex offender treatment obligations or the "multiple" other incidents of abuse involving P.G.

In an initial draft of her report, Ms. Patton had expressed her concerns about T.D.'s placement with his father, including: Mr. Duerson's criminal record (and specifically his attempted sexual assault on P.G. in 2005); the 2007 revocation of his probation for purposeful failure to fulfill his sex offender treatment obligations; and his therapist's concern that he was "not taking treatment seriously." Dist. Ct. Order

at 10.  Ms. Patton intentionally omitted those concerns in her final report to the juvenile court.  She did so because her supervisor, Ms. Ketema, had told her that DDHS was going to return T.D. to Mr. Duerson and Ms. Patton should "not go against the DDHS."  *Id.* (quotations omitted).  Ms. Patton feared she would be fired if she included her knowledge or concerns in her final report.

### b.  *The Hearing*

Ms. Patton and Ms. Gomez attended the hearing on September 7, 2010.  No other professional from the August 17, 2010 meeting was there.  At the hearing, both Ms. Gomez and Ms. Patton recommended T.D.'s transfer to Mr. Duerson's custody.[9]  The juvenile court granted permission to begin that transition.

Before the hearing, Ms. Patton did not discuss the information in the Trails Report with Ms. Gomez.  Ms. Gomez testified that she was under a misconception about the nature of Mr. Duerson's 2005 conviction, and, had she known about the details of the offense documented in the Trails Report, she "probably would not have recommended T.D.'s placement with [Mr. Duerson]" to the juvenile court.  *Id.* at 11. (brackets and quotations omitted).

### 7.  **T.D.'s Transition and Placement in Mr. Duerson's Home**

Meetings were held on September 17 and October 8, 2010, to complete a plan to transition T.D. from Shiloh House to Mr. Duerson's home.  T.D., Ms. Garcia, Mr.

---

[9] Because T.D. and Mr. Duerson are American Indians, T.D.'s placement was subject to the Indian Child Welfare Act ("ICWA"), which requires "active efforts . . . to prevent the breakup of the Indian family."  25 U.S.C. § 1912(d).  No party argues that ICWA's standards affect the outcome of this case.

Duerson (at one meeting), Ms. Hutchinson, Mr. Hommes, Mr. Duerson's wife, Ms. Gomez, and a representative for DDHS attended. Ms. Patton did not attend either meeting.

On October 21, 2010, Ms. Gomez filed a Stipulated Agreement with the juvenile court reporting that T.D. had successfully transitioned to Mr. Duerson's home on October 15, 2010. The Stipulated Agreement asked the court to give Mr. Duerson "temporary legal custody" of T.D. so that T.D. could enroll in school and be added to his father's public assistance benefits. *Id.* at 13. It also documented that Ms. Patton agreed with the placement. Other than Ms. Patton and T.D.'s parents, none of the attendees at the August 17, 2010 meeting, such as Ms. Hutchinson or Mr. Hommes, were listed on the Stipulated Agreement.

On November 3, 2010, the juvenile court granted "temporary legal and physical custody" of T.D. to Mr. Duerson "under an order of supervision by [DDHS]." *Id.* (quotations omitted).

8. **The December 13, 2010 Hearing**

Ms. Patton prepared a report for a December 13, 2010 juvenile court hearing. It stated that Mr. Duerson had successfully completed probation, was compliant with DDHS's treatment plan, and was in contact with Ms. Patton. It also stated that T.D.'s behavior was improving to a point where he could transition from attending school at Shiloh House to attending a local school. In the report, Ms. Patton recommended that T.D. remain in Mr. Duerson's temporary custody.

In December 2010, Mr. Duerson and T.D. were discharged from their required family therapy sessions. The therapist stated in her discharge report that the family had reached their treatment goals and that she had "no safety concerns regarding [Mr. Duerson's] house." *Id.* at 14.

9. **The March 21, 2011 Hearing**

The juvenile court held another permanency planning hearing on March 21, 2011. In her report for the hearing, Ms. Patton said T.D.'s behavior had improved at school and at home and that, overall, T.D. "was flourishing" in Mr. Duerson's home. *Id.* She noted a minor concern that T.D. had missed 30 class periods in the second school term, which Mr. Duerson blamed on conflicting appointments and T.D. being sick. Ms. Patton said that she encouraged the family to try not to schedule appointments during school. Ms. Patton's report recommended that temporary custody of T.D. remain with Mr. Duerson.

10. **The June 13, 2011 Hearing**

In a report prepared for a June 13, 2011 permanency planning hearing, Ms. Patton wrote that Mr. Duerson had used physical punishment on T.D. Specifically, T.D. had told her and Ms. Gomez that his father had hit him across the back with a wooden mop handle for not completing his chores. School officials had told her that, in the last few months, T.D. had spent a lot of time at the nurse's office complaining of sickness and body aches, appeared to be afraid of his father, and at times did not want to go home. Ms. Garcia had reported that, during weekend stays with her, T.D. had acted disrespectfully, refused to complete chores, smelled badly, and had unclean

- 14 -

clothes when he arrived at her home. Ms. Patton stated in her report that, as a result of this information, she had referred Mr. Duerson to participate in DDHS's Fatherhood Initiative Program.

In the report, Ms. Patton stated that, although she had "some concerns" with Mr. Duerson's "parenting skills," she still recommended that T.D. remain in his father's custody. *Id.* at 15. She testified at her deposition that she made this recommendation despite the fact that she truly "wanted to remove T.D. from [his father's] home because she was afraid for T.D.'s safety." *Id.* She did not express her concerns to the juvenile court because her supervisor, Ms. Ketema, had told her that T.D. would remain in his father's home, and Ms. Patton was afraid she would be fired if she did not recommend T.D. remain with his father.

At the June 13, 2011 hearing, the juvenile court ordered Mr. Duerson to participate in the recommended Fatherhood Initiative Program and not to use physical discipline on T.D.

11. **The August 25, 2011 Hearing**

In a report for an August 25, 2011 hearing, Ms. Patton informed the juvenile court that she was having trouble reaching Mr. Duerson and was unable to contact him for a period of time. She had no face-to-face contact with T.D. in July, as her supervisor had instructed.

Ms. Patton reported that she could confirm Mr. Duerson's attendance at only one fatherhood class since the last hearing in June. She also reported that she had tried several times, without success, to conduct a written parental assessment of Mr.

- 15 -

Duerson. She stated, however, that Mr. Duerson was participating actively in family therapy and acting appropriately with young children. She recommended that T.D. remain in the temporary custody of Mr. Duerson. And, although she had failed to visit Mr. Duerson's home at least every other month as DDHS policy required, the report mistakenly stated Ms. Patton had made monthly visits to the home.[10]

12. **T.D.'s Removal from Mr. Duerson's Home**

On September 19, 2011, DDHS received a report of sexual contact between T.D. and his half-brother. On September 21, 2011, DDHS removed T.D. from Mr. Duerson's home and took him into its temporary custody the next day.

In a report prepared for a November 16, 2011 hearing, Ms. Patton stated she had minimal communication with Mr. Duerson since the last hearing in August, and that Mr. Duerson's youngest children had been removed from the home due to domestic violence and drug use. She further reported that Mr. Duerson had attended only one fatherhood class since getting temporary custody of T.D., had moved out of state, and was not complying with his treatment plan.

13. **Report and Investigation of Abuse**

In March 2014, T.D. reported that Mr. Duerson had abused him while he was in his father's temporary custody. DDHS investigated and concluded that:

- In August 2011, Mr. Duerson had repeatedly sexually assaulted T.D. by forcibly orally sodomizing him twice;

---

[10] Whether Ms. Patton failed to observe Mr. Duerson's home at least every other month and whether a failure to do so violated DDHS's policies are disputed, but we are obliged to take the facts in the light most favorable to T.D.

- Mr. Duerson had hit T.D. with a broomstick and threatened to knock him unconscious and send him to the hospital for not performing oral sex on him;

- Mr. Duerson had forced T.D. to perform oral sex on him for 10-15 minutes as punishment for T.D.'s staying up past his bedtime;

- Mr. Duerson had physically forced T.D. and his three-year-old brother to perform oral sex on each other; and

- Mr. Duerson had told T.D. not to tell anyone about the abuse.

DDHS determined the abuse T.D. had suffered while in Mr. Duerson's home was "severe." *Id.* at 18.

## B. *Procedural Background*

In 2014, Ms. Garcia, on behalf of T.D., sued Ms. Patton and DDHS in state court alleging they violated T.D.'s substantive due process right under the Fourteenth Amendment. The defendants removed the case to the United States District Court for the District of Colorado. Plaintiffs' second amended complaint, the operative one here, raised a § 1983 substantive due process claim against Ms. Patton and DDHS based on a danger-creation theory and a special-relationship theory.

T.D. filed a motion for partial summary judgment on the special-relationship theory. Ms. Patton filed a cross-motion for summary judgment on both theories, asserting a defense of qualified immunity. DDHS also moved for summary judgment on the § 1983 claim.

The court granted summary judgment in Ms. Patton's favor on the special-relationship theory and against her on the danger-creation theory. On the danger-creation theory, the court concluded that Ms. Patton's conduct amounted to a

constitutional violation and that, based on *Currier*, her conduct violated clearly established law.  The court also granted summary judgment to DDHS.

T.D. does not appeal the grant of summary judgment to Ms. Patton on the special-relationship theory or the grant of summary judgment to DDHS.  This appeal thus concerns only the court's order denying qualified immunity to Ms. Patton on T.D.'s danger-creation claim.

## II.  **DISCUSSION**

We affirm the district court's denial of qualified immunity because the facts, taken in the light most favorable to T.D., show Ms. Patton violated T.D.'s clearly established substantive due process right under the Fourteenth Amendment.  We first describe the applicable standard of review and legal standards.  We then analyze whether (1) Ms. Patton violated T.D.'s substantive due process right under a danger-creation theory and (2) whether his right was clearly established.

### A. *Standard of Review*

"We review summary judgment de novo, applying the same legal standard as the district court."  *Gutierrez*, 841 F.3d at 900.  A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party," *Gutierrez*, 841 F.3d at 900, here T.D., as the nonmoving party on the danger-creation theory.

B. *Legal Standards*

1. **42 U.S.C. § 1983 and Qualified Immunity**

Under 42 U.S.C. § 1983, a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." "Individual defendants named in a § 1983 action may raise a defense of qualified immunity, which shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law." *Gutierrez*, 841 F.3d at 899.

"Once an individual defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* at 900 (quotations omitted). "This is a heavy burden. If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017).

A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation. *Gutierrez*, 841 F.3d at 900. To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). Although there need not be a "case directly on point," *id.*

(quoting *Mullinex*, 136 S. Ct. at 308), "[a]n officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it.'" *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (brackets omitted) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

Courts must not define "clearly established law at a high level of generality." *Id.* at 1776 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, "the clearly established law must be 'particularized' to the facts of the case." *White*, 137 S. Ct. at 552 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Otherwise, 'plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Id.* (brackets and ellipses omitted) (quoting *Anderson*, 483 U.S. at 639)).

2. **Fourteenth Amendment Danger-Creation Claims**

The Due Process Clause of the Fourteenth Amendment provides "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. T.D.'s claim is based on substantive due process because he alleges that a state official deprived him of a liberty interest by creating or increasing the danger of private violence. *Currier*, 242 F.3d at 920.

To evaluate whether Ms. Patton is entitled to qualified immunity on T.D.'s substantive due process claim, we discuss: (1) the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989),

- 20 -

which established the general rule that state officials are not liable for acts of private violence and set the stage for the danger-creation exception to that rule; (2) our decisions interpreting *DeShaney* to allow a danger-creation exception when state officials affirmatively create the danger of private violence or increase a plaintiff's vulnerability to that danger; and (3) our decision in *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001), which was the basis of the district court's order and which the parties agree is the critical case to evaluate whether Ms. Patton's conduct violated T.D.'s clearly established right.[11]

   a.  *DeShaney*

In *DeShaney*, the complaint alleged Winnebago County social workers violated a child's due process rights for "failing to intervene to protect [the child Joshua] against a risk of violence at his father's hands of which they knew or should have known."  489 U.S. at 193.  The Supreme Court rejected that the social workers could be liable.

The Court wrote:  "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.  The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  *Id.* at 195. Accordingly, "[a]s a general matter . . . a State's failure to protect an individual

---

[11] The court also cited *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253 (10th Cir. 1998), as a basis for its clearly established determination.  We disagree with the district court that *Armijo*, which has sufficiently distinguishable facts from those here, could provide clearly established law.  We thus do not detail the facts of *Armijo*.

against private violence simply does not constitute a violation of the Due Process

Clause." *Id.* at 197.  The Court wrote:

> While the State may have been aware of the dangers that Joshua faced in the free world, it *played no part in their creation*, nor did it do anything to render him *any more vulnerable to them*.  That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, *it placed him in no worse position than that in which he would have been had it not acted at all*; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter.  Under these circumstances, the State had no constitutional duty to protect Joshua.

*Id.* at 201 (emphasis added).

b.  *Danger-creation exception*

Relying on the language emphasized above in *DeShaney*, this court has

recognized that, as an exception to *DeShaney*'s general rule, a state official may be

liable when "a state actor affirmatively acts to create, or increase[] a plaintiff's

vulnerability to, danger from private violence."  *Currier,* 242 F.3d at 923; *see also*

*Uhlrig v. Harder*, 64 F.3d 567, 572 & n.7 (10th Cir. 1995).[12]  Although the Supreme

Court has not yet confirmed that a danger-creation exception exists under *DeShaney*,

its statements in *DeShaney* "ha[ve] led every Circuit Court of Appeals . . . to recognize

an exception to *DeShaney* for 'state-created dangers.'"  *Jasinski v. Tyler*, 729 F.3d 531,

---

[12] As noted, we have recognized another exception to *DeShaney*'s general rule—the special-relationship theory.  *Gillen*, 710 F.3d at 1173.  T.D. sought to invoke that theory in district court, but the court determined it did not apply and T.D. does not appeal that ruling.

538 (6th Cir. 2013) (collecting cases); *accord Butera v. Dist. of Columbia*, 235 F.3d 637, 648-49, 651 (D.C. Cir. 2001).[13]

To invoke the danger-creation theory, a plaintiff must show a state actor "affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *Currier*, 242 F.3d at 923; *see also Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002). If a plaintiff meets those preconditions, a plaintiff must next demonstrate:

> (1)      the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
>
> (2)      plaintiff was a member of a limited and specifically definable group;
>
> (3)      defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
>
> (4)      the risk was obvious or known;
>
> (5)      defendants acted recklessly in conscious disregard of that risk; and
>
> (6)      such conduct, when viewed in total, is conscience shocking.

*Currier*, 242 F.3d at 918 (spacing added).

On the final element—whether the conduct is conscience shocking—neither ordinary negligence nor permitting unreasonable risks qualifies as conscience shocking. *Ruiz*, 299 F.3d at 1184. "Rather, a plaintiff must demonstrate a degree of

---

[13] *See Arledge v. Franklin Cty.*, 509 F.3d 258, 262-64 (6th Cir. 2007) (noting, in a child-placement case, the circuit had "recognized . . . the state-created danger theor[y] of due process liability" in *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066-67 (6th Cir. 1998), but holding the facts did not support the claim).

- 23 -

outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* (quotations omitted).

### c. *Currier v. Doran*

Our decision in *Currier*, which involved a danger-creation claim brought against social workers for New Mexico's Children, Youth and Families Department ("CYF"), 242 F.3d at 908, controls the outcome of this case.

#### i. Factual Background

In *Currier*, CYF social worker Shirley Medina visited the home of two children, L.J. and A.J., who were reportedly neglected by their mother. *Id.* at 909. After finding the mother had left the state, Ms. Medina placed the children in the physical custody of CYF. *Id.* CYF petitioned New Mexico's juvenile court for an order granting legal custody of the children to CYF. *Id.*

In her petition, Ms. Medina told the court that the children's father, Christopher Vargas, had not supported the children, had allowed them to live in "alarming conditions," and would "have a hard time taking care of the kids." *Id.* She nonetheless recommended that the court grant physical custody of the children to Mr. Vargas, while keeping legal custody with CYF. *Id.*

Before the hearing on the petition, CYF social worker Tom Doran learned that Mr. Vargas had a history of financial irresponsibility, including having made only eight child-support payments in the preceding three years. *Id.* But Mr. Doran said nothing at the hearing about that knowledge. *Id.*

On May 10, 1993, based on Ms. Medina's recommendation, the court granted physical custody of the children to Mr. Vargas and kept legal custody with CYF. *Id.*

In July 1993, Mr. Doran noticed a small bruise on A.J.'s cheek. *Id.* Mr. Vargas's girlfriend explained it was a result of a playground fall. *Id.* In August 1993, A.J. had another bruise that was also explained as a result of a fall. *Id.* Mr. Doran did not investigate either bruise further. *Id.*

The mother eventually returned to the state and told the children's guardian ad litem that Mr. Vargas and his girlfriend were physically abusing the children, including by dunking them in a bathtub to punish them. *Id.* Mr. Doran learned about these accusations but failed to investigate. *Id.*

On October 19, 1993, based on Mr. Doran's recommendation, Mr. Vargas was awarded legal custody of the children. *Id.* at 909, 919 & n.6. This court determined "[Mr.] Doran was responsible for the [juvenile court's] decision to grant [Mr.] Vargas legal custody, through either his failure to investigate and report to the court or through his affirmative recommendation." *Id.* at 919.

Around that time, further indicia of abuse came to light. For instance, on October 20, 1993, CYF workers noticed bruises on L.J., who said that "Da, Da" had caused them. *Id.* at 910. At the guardian ad litem's request, Mr. Doran interviewed Mr. Vargas and his girlfriend about the bruises, which the couple said were caused by falling from a bunk bed ladder. *Id.* On November 17, 1993, CYF officials again found bruises on A.J., also explained as caused by a bunk bed fall, and unexplained

- 25 -

bite marks on L.J. *Id.* CYF then removed L.J. and A.J. from Mr. Vargas's home and placed them with relatives. *Id.*

Mr. Doran prepared an affidavit for a November 19, 1993 meeting with his supervisor, Melba Gonzales, stating that the children would be subject to further abuse if permitted to stay with Mr. Vargas. *Id.* But Mr. Doran "failed to strongly advocate against return of the children to [Mr.] Vargas." *Id.* Ms. Gonzales concluded that the children had to be returned to Mr. Vargas, which happened shortly thereafter. *Id.*

After the children returned to their father's home, CYF received requests to investigate possible physical abuse of the children. *Id.* Ms. Medina took over the investigation and discovered bruises on A.J., but concluded that they were the result of a fall. *Id.* During the investigation, L.J. told Ms. Medina that she had been spanked with a belt. *Id.* Ms. Medina and Mr. Doran instructed the children's mother to stop making allegations that Mr. Vargas was abusing the children. *Id.*

A few months later, Mr. Vargas poured boiling water on A.J., causing severe burns. *Id.* At the emergency department, doctors found A.J. "was bruised everywhere he was not burned." *Id.* A.J. eventually died in the intensive care unit. *Id.* L.J. was also found "covered with bruises" and removed from Mr. Vargas's home. *Id.*

Representatives for A.J. and L.J. brought a substantive due process claim under 42 U.S.C. § 1983 based on the danger-creation theory against Ms. Medina, Mr.

- 26 -

Doran, Ms. Gonzales, and one other CYF worker. *Id.* at 908. The district court

denied their assertion of qualified immunity. *Id.* at 911.

ii. Analysis in *Currier*

On appeal, this court addressed: (1) whether the facts supported a

constitutional violation under the danger-creation theory; and (2) whether there was

clearly established law. *See id.* at 917-25. We focus here on the claim against Mr.

Doran, Ms. Medina, and Ms. Gonzales, whose actions were most relevant to T.D.'s

claim.[14]

1) Constitutional Violation

*Currier* first addressed whether *DeShaney* barred the danger-creation claim

and answered no. It held *DeShaney* did not bar the claim relating to the children's

placement in their father's home because the children "would not have been exposed

to the dangers from their father *but for the affirmative acts of the state*." *Id.* at 918-

19 (emphasis added). The court wrote: "When the state affirmatively acts to remove

a child from the custody of one parent and then places the child with another parent,

*DeShaney* does not foreclose constitutional liability." *Id.* at 919. The court further

addressed whether the facts supported a constitutional violation under the danger-

creation theory.

As to Mr. Doran, the panel answered yes. On the first five elements of the

danger-creation claim:

---

[14] Although Ms. Patton asserts that "the only potentially relevant analysis in
*Currier* relates to the actions of Doran," Aplt. Br. at 41, we regard the other social
workers' actions as relevant to this appeal.

Doran's conduct meets the danger creation theory of liability . . . . Doran "created the danger or increased the plaintiffs' vulnerability to the danger" through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody to Vargas. [L.J. and A.J.] were members "of a limited and specifically definable group": children the state has removed from their natural parent and taken into state custody. By failing to investigate the allegations of child abuse and by recommending that Vargas assume legal custody, Doran's conduct put [A.J. and L.J.] at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded.

*Id.* at 919-20 (brackets and citations omitted). The court considered Mr. Doran's inaction (i.e., his failure to investigate) because it was coupled with his "affirmative conduct in removing the children from their mother and placing the children with their father." *Id.* at 920 n.7.[15]

Although the sixth element was a "somewhat closer question," *Currier* held Mr. Doran's conduct, when "viewed in total," shocked the conscience:

---

[15] The panel wrote:

It is true that the conduct Plaintiffs complain of is partially a failure by Doran to act on particular allegations of abuse. Doran's failure to investigate allegations of abuse while the children were in state legal custody should be distinguished, however, from a claim that the state failed to rescue the children once legal custody was given to Vargas. Doran's failure to investigate allegations of abuse should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father.

*Id.*

- 28 -

In light of the initial information Doran had about Vargas' financial irresponsibility, and in light of the numerous bruises and allegations of abuse, Doran's failure to investigate the bruises and allegations and his subsequent responsibility for the court order granting Vargas legal custody could be conscience shocking, depending, of course, on further context as provided by discovery.

*Id.* at 920.

As to Ms. Medina, *Currier* held her involvement in the initial removal of the children from their mother's home could not support a danger-creation claim. *Id.* at 921. But she could be liable for instructing the mother to stop making allegations of child abuse after Mr. Vargas received custody because doing so "affirmatively" increased the children's vulnerability to abuse. *Id.*[16]

As to Ms. Gonzales, we held that, as a supervisor, she violated the children's constitutional rights by having knowledge that Mr. Doran and Ms. Medina were depriving children of those rights and failing to correct their conduct through training. *Id.* at 923.

*Currier* shows Mr. Doran, Ms. Medina, and Ms. Gonzales could be held individually responsible for their unconstitutional actions when they collectively contributed to a deprivation of the children's constitutional rights.

---

[16] Along with Ms. Medina, Mr. Doran had instructed the mother to stop making allegations of abuse. *Id.* at 910. The *Currier* panel specifically addressed the social workers' instruction only as to Ms. Medina, and held it was relevant to and supported the danger-creation claim against her because her conduct increased the children's vulnerability to abuse from Mr. Vargas. *Id.* at 921. The panel's earlier discussion of whether to consider Mr. Doran's post-placement conduct was focused on his "failure to intervene," which does not describe affirmatively instructing the children's mother. *Id.* at 919-20.

### 2) Clearly Established Law

*Currier* finally addressed whether the defendants' unconstitutional actions violated "clearly established" law.  *Id.* at 923.

As to Mr. Doran, *Currier* held the law clearly established that "a reasonable state official would have known in 1993 and 1994 that reckless, conscience shocking conduct that altered the status quo and placed a child at substantial risk of serious, immediate, and proximate harm was unconstitutional."  *Id.* at 924.  The law regarding Ms. Gonzales's failure to train was also clearly established.  *Id.* at 925.  Although the law was not clearly established then that the timing of Ms. Medina's conduct was relevant to a constitutional violation, *id.* at 925, our decision in *Currier* made it so going forward.  That is, *Currier* made clear in its analysis of the claim against Ms. Medina that affirmative conduct after placement of a child can support a danger-creation claim.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (discussing how a court's addressing prong one—even if there is no clearly established law under prong two—"promotes the development of constitutional precedent" for future cases).

The *Currier* court therefore affirmed the district court's denial of qualified immunity for the danger-creation claim against Mr. Doran and Ms. Gonzales, but reversed as to the claim against Ms. Medina.  242 F.3d at 925.

### C. *Analysis*

Ms. Patton's conduct violated T.D.'s clearly established substantive due process right under *Currier* to be free from state-created danger.  We therefore affirm

the district court's denial of Ms. Patton's summary judgment motion asserting a defense of qualified immunity to the danger-creation claim.

On appeal, as she did in district court, Ms. Patton addresses only the second prong of her qualified-immunity defense—whether she violated a clearly established constitutional right. We nevertheless address both prongs, as the district court did, because the questions of whether there was a constitutional violation and, if so, whether the violation was of clearly established law, are intertwined. *See Pearson*, 555 U.S. at 236 ("It often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." (brackets and quotations omitted)).

First, we conclude, based on *Currier*, that Ms. Patton's recommendations to place and keep T.D. in Mr. Duerson's temporary custody coupled with her failure to investigate whether Mr. Duerson was abusing T.D., despite being on notice of evidence supporting such abuse, violated T.D.'s substantive due process right to be free from state-created danger.

Second, we conclude, again based on *Currier*, that T.D.'s substantive due process right was clearly established at the time of Ms. Patton's conduct in 2010 and 2011. As explained below, *Currier* sufficiently defined T.D.'s right to put the unconstitutional nature of Ms. Patton's conduct "beyond debate." *See White*, 137 S. Ct. at 551; *Sheehan*, 135 S. Ct. at 1774.

1. **The Constitutional Violation**

We first address whether Ms. Patton's "affirmative conduct" satisfied *DeShaney*'s danger-creation exception. *Ruiz*, 299 F.3d at 1183. Determining that it did, we then turn to the elements of T.D.'s danger-creation claim.

Although we regard T.D.'s danger-creation claim as a single claim encompassing all of Ms. Patton's alleged conduct, we sometimes refer to Ms. Patton's "pre-placement conduct" and "post-placement conduct." This concerns her conduct before and after November 3, 2010, when T.D. was placed in the temporary legal and physical custody of his father. We do so in part to align with our analysis in *Currier*, which looked at whether there was "affirmative conduct" before and after the children were placed. 242 F.3d at 919-21.

   a. *Affirmative conduct*

This section addresses whether T.D. meets the necessary precondition of "affirmative conduct" for a danger-creation claim. *Ruiz*, 299 F.3d at 1183.

*Currier* supports that, because Ms. Patton recommended T.D.'s placement with Mr. Duerson, she engaged in affirmative pre-placement conduct. In *Currier*, the court stated: "When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, *DeShaney* does not foreclose constitutional liability." 242 F.3d at 919. Mr. Doran's pre-custody conduct met that standard when he took "affirmative conduct in removing the children from their mother and placing the children with their father." *Id.* at 920 & n.7. Similarly here, Ms. Patton participated in removing T.D. from his mother's home, intentionally

- 32 -

withheld relevant information from her final report to the juvenile court, and recommended T.D.'s placement in Mr. Duerson's home at both the September 9, 2010 juvenile court hearing and in the October 21, 2010 Stipulated Agreement.

*Currier* also supports that Ms. Patton acted affirmatively after November 3, 2010, when Mr. Duerson took temporary custody of T.D. In *Currier*, we determined that Ms. Medina, after the children were placed in Mr. Vargas's custody, took "affirmative conduct" sufficient to support a danger-creation claim by discouraging the children's mother from making allegations of abuse, thereby cutting off potential sources of private aid. 242 F.3d at 921-22. The ruling against Ms. Medina shows that post-placement conduct may be considered for a danger-creation claim provided it is "affirmative." After T.D. was placed with Mr. Duerson on November 3, 2010, Ms. Patton did not merely "st[and] by and d[o] nothing when suspicious circumstances dictated a more active role for [her]." *DeShaney*, 489 U.S. at 203. She acted affirmatively. In her reports prepared for juvenile court hearings on December 13, 2010, March 21, 2011, June 13, 2011, and August 25, 2011, she recommended that T.D. "remain" in Mr. Duerson's temporary custody. She made the June 13 and August 25 recommendations in the face of having received information that Mr. Duerson was abusing T.D. Her recommendations contributed to Mr. Duerson's retaining "temporary physical and legal custody" over T.D. and furthering the danger Mr. Duerson posed to T.D. *See Currier*, 242 F.3d at 918 ("[A.J. and L.J.] would not have been exposed to the dangers from their father but for the affirmative acts of the state; the same cannot be said for Joshua in *DeShaney*.").

- 33 -

Our review of T.D.'s danger-creation claim thus includes Ms. Patton's conduct both before and after T.D. was placed in Mr. Duerson's temporary custody on November 3, 2010.

b. *Elements of the danger-creation claim*

The facts taken in T.D.'s favor show he satisfies the six elements of his danger-creation claim.

i. <u>Element 1: Ms. Patton created or increased the danger posed to T.D.</u>

Ms. Patton created the danger of private violence or increased T.D.'s vulnerability to the danger posed by Mr. Duerson. *See Currier*, 242 F.3d at 918. We devote most of our analysis to this element.

<u>First</u>, Ms. Patton was one of those responsible for T.D.'s initial placement in Mr. Duerson's home and thus created or increased T.D.'s vulnerability to the danger posed by Mr. Duerson.[17] In her September 7, 2010 report to the juvenile court and at the hearing, Ms. Patton intentionally deleted from her report her concerns about Mr. Duerson and withheld certain facts undermining Mr. Duerson's fitness as a caretaker, including:

(1) details of Mr. Duerson's 2005 conviction of attempted sexual assault on a minor, his step-daughter P.G. who was in his care, documented in the Trails Report;

(2) his 2005 violation of a restraining order by attempting to contact P.G.;

---

[17] When stating Ms. Patton was "responsible" for T.D.'s placement, we do not intend to suggest she was solely responsible for the placement decision. Rather, we use the term to describe her significant contribution to his placement, thereby making her responsible, potentially along with others, for creating the danger posed to T.D.

(3)    his 2007 probation violation due to his purposeful failure to fulfill his sex offender treatment obligations;

(4)    his other charged offenses including misdemeanor wrongs to minors and misdemeanor domestic violence; and

(5)    "multiple other incidents" involving Mr. Duerson's physical and sexual abuse of P.G.

Nor did Ms. Patton express her own admitted negative "gut" feeling about T.D.'s placement with his father.[18]  Viewing the facts in T.D.'s favor, we conclude a reasonable jury could find Ms. Patton's failure to inform the juvenile court of her knowledge and concerns, when coupled with her affirmative incomplete and therefore misleading statements, influenced the juvenile court's placement decision, making Ms. Patton responsible for T.D.'s placement in Mr. Duerson's home—a place of danger.

Second, Ms. Patton created or increased T.D.'s vulnerability to the danger posed by Mr. Duerson after T.D. was placed in his temporary custody on November 3, 2010.  In her four post-placement hearing reports, she recommended that T.D.

---

[18] On appeal, Ms. Patton emphasizes that there was "no question the Juvenile Court was aware of [Mr. Duerson's] attempted sexual assault," and that Mr. Duerson had already completed his probation and sex offender treatment, so her removal of those facts bore no "constitutional significance."  Aplt. Br. at 44-45.  But Ms. Patton's argument misses the point that she intentionally excluded information from her report that was potentially important to the juvenile court's placement decision.  Nor does she present evidence or argue the juvenile court independently had the information she excluded from her reports.  Indeed, although the juvenile court knew about the facts of Mr. Duerson's conviction and probation, there is no evidence showing it had access to the Trails Report—an internal DDHS document that detailed particular facts of his offense and documented "multiple" other incidents of abuse against P.G.

- 35 -

remain in Mr. Duerson's temporary custody, despite having evidence that he was physically abusing T.D. The record shows:

(1)     T.D. reported to her that Mr. Duerson had hit him with a wooden mop handle for not completing chores; and

(2)     School officials reported to her that T.D. was spending significant time at the nurse's office complaining of sickness and body aches, appeared to be afraid of his father, and at times did not want to go home to his father.

Ms. Patton did not disclose this information until her third post-placement report on June 13, 2010, and she never disclosed her fear for T.D.'s safety and true desire to remove T.D. from the home based on that information. Ms. Patton instead recommended in all of her reports that T.D. remain in Mr. Duerson's temporary custody. Her decision to withhold her safety concerns, coupled with her recommendations to keep T.D. in his father's home in the face of evidence of potential abuse, made her one of those responsible for the juvenile court's decision to keep T.D. in Mr. Duerson's temporary custody.

Third, Ms. Patton failed to investigate whether Mr. Duerson was abusing T.D.[19] As noted earlier, the *Currier* court considered Mr. Doran's failure to investigate whether Mr. Vargas was abusing the children because his failure was coupled with his "affirmative conduct in removing the children from their mother and

---

[19] Ms. Patton asserts that "there is no allegation Ms. Patton failed to investigate any allegation of abuse at any point." Aplt. Br. at 50. The complaint alleged otherwise. *See, e.g.*, App., Vol. I at 31, ¶¶ 26-28 (alleging Ms. Patton failed to monitor Mr. Duerson's home at least every month to uncover the extent of the abuse on T.D.); *id.* at ¶¶ 31-34 (alleging Ms. Patton failed to investigate credible reports of abuse).

placing the children with their father." *Id.* at 920 n.7. *Currier* thus supports that we may consider Ms. Patton's failure to investigate evidence Mr. Duerson was abusing T.D. because it was coupled with her affirmative actions in exposing T.D. to the danger posed by his father.

When T.D. was in Mr. Duerson's temporary custody, Ms. Patton received (1) T.D.'s allegation that Mr. Duerson had hit him with a wooden mop and (2) the school officials' reports that T.D. had appeared fearful of his father, complained of body aches, and spent significant time in the school nurse's office. Despite knowing about these allegations, Ms. Patton failed to conduct at-home site visits to Mr. Duerson's home at least every other month, as DDHS policy required.[20] Nor did she complete DDHS's required face-to-face contact with T.D. in July 2011, as Ms. Ketema had directed her to do. She also failed to follow up after T.D. had missed 30 class periods—merely accepting Mr. Duerson's excuses that T.D. had conflicting appointments or was "sick." *See, e.g.*, *Currier*, 242 F.3d at 919 (concluding Mr. Doran failed to investigate by not following up after Mr. Vargas reported the children's bruises were the result of falls). Ms. Patton also reported at the August 25, 2011 hearing that (1) she "was having difficulty" contacting Mr. Duerson for a

---

[20] Although whether she visited his home every other month and whether she was required to do so by DDHS are in dispute, we must view those facts in T.D.'s favor.

The district court justified its decision not to consider Ms. Patton's alleged failure to visit Mr. Duerson's home at least once every other month on the ground it did "not constitute affirmative action." Dist. Ct. Order at 39 n.23. But as our analysis shows, Ms. Patton's failure to visit Mr. Duerson's home may be relevant so long as there is accompanying affirmative action. *See Currier*, 242 F.3d at 920 & n.7

"period of time," and (2) she had failed to conduct a written parental assessment of Mr. Duerson after the June 13, 2011 hearing.  Dist. Ct. Order at 16.

In sum, her actions amounted to a failure to investigate evidence that Mr. Duerson was abusing T.D.  *See Currier*, 242 F.3d at 919-20 (holding that Mr. Doran created the danger by failing to investigate evidence of potential abuse, including noticing bruises on the children and learning about specific and general allegations of abuse).

*       *       *       *

By (1) recommending that T.D. be placed and later recommending that T.D. remain in Mr. Duerson's temporary custody, (2) intentionally removing from her report to the juvenile court her knowledge and concerns regarding Mr. Duerson's fitness as a caretaker, and (3) failing to investigate evidence of potential abuse, Ms. Patton helped create or increase T.D.'s vulnerability to the danger posed by Mr. Duerson both before and after November 3, 2010.  *See id.* at 919 (providing that Mr. Doran was responsible for creating the danger in granting Mr. Vargas legal custody "through either his failure to investigate and report to the court [evidence regarding Mr. Vargas's history of financial responsibility] or through his affirmative recommendation").

### ii.  Element 2:  Limited and specifically definable group

T.D. was a member of a limited and specifically definable group.  *See id.* at 918.  In *Currier*, we regarded the group to be "children the state has removed from their natural parent and taken into state custody," *id.* at 920, and continued to view

the children as members of that group after their placement with Mr. Vargas. *See id.* at 921-22 (holding Ms. Medina acted unconstitutionally under a danger-creation theory for her conduct after the children had been placed in the custody of Mr. Vargas).

Because the state removed T.D. from his natural parent (Ms. Garcia) and took him into state custody, T.D. falls within the same "limited and specifically definable group" as the children in *Currier*. *Id.* at 920 (quotations omitted). *Currier* supports that he remained in that group even after Mr. Duerson was awarded temporary custody. *Id.* at 921-22.

### iii. Element 3: Ms. Patton's conduct put T.D. at substantial risk of serious, immediate, and proximate harm

Ms. Patton's conduct helped put T.D. at a substantial risk of serious, immediate, and proximate harm. *Id.* at 918.

We agree with the district court's determination that "a jury could quite easily believe that [Mr. Duerson's] prior sexual offense against P.G., his step-child, would have provided notice that he might re-offend against another child in his care." Dist. Ct. Order at 36. This was especially so given Ms. Patton's withholding information from the juvenile court of Mr. Duerson's purposeful failure to fulfill his sex offender treatment obligations leading to his 2007 probation violation,[21] and "the multiple incidents of improper contact between [Mr. Duerson] and P.G. in the Trails report."

---

[21] Although Mr. Duerson eventually completed his sex offense treatment before T.D.'s placement with him, Mr. Duerson's previous unwillingness to comply with such treatment may have been relevant to the juvenile court's assessment of his commitment to maintaining a safe environment for another minor placed in his care.

*Id.* The latter showed his offense was not an isolated incident and increased the risk he posed of reoffending. Ms. Patton thus contributed to putting T.D. at risk of serious, immediate, and proximate harm by withholding relevant information and recommending T.D. be placed with his father. Ms. Patton further contributed to the risk of harm to T.D. after the placement by failing to investigate evidence of potential abuse and continuing to recommend T.D. remain in Mr. Duerson's temporary custody despite being on notice that Mr. Duerson was abusing T.D.

> iv. <u>Elements 4 and 5: Ms. Patton acted recklessly and in conscious disregard of an obvious or known risk</u>

The record shows that Ms. Patton acted recklessly and in conscious disregard of a risk (element 4) that was obvious or known (element 5). *See Currier*, 242 F.3d at 918.

In her initial draft report for the September 7, 2010 hearing, Ms. Patton had included her concerns about placing T.D. with Mr. Duerson based on her knowledge of his criminal history—in particular, his abusing a child in his care. But she intentionally deleted those concerns in the final report for fear of being fired. In her June 13, 2011 hearing report, although she reported various incidents of potential abuse to the juvenile court, Ms. Patton nonetheless intentionally withheld her concerns that she feared for T.D.'s safety and her professional judgment that T.D. should be removed from his father's home.

Ms. Patton's intentional exclusion of her knowledge and concerns from her hearing reports showed she acted recklessly and in conscious disregard of an obvious

or known risk that Mr. Duerson posed to T.D. *See id.* at 918 (holding that Mr. Doran acted recklessly in conscious disregard for the children's safety through his affirmative recommendation, despite his knowledge of allegations of abuse and facts undermining Mr. Vargas's fitness as a caretaker).

> v. <u>Element 6:  Ms. Patton's conduct was conscience shocking</u>

Ms. Patton's conduct, viewed "in total" and in T.D.'s favor, was conscience shocking in light of:

(1)     her withholding of certain information about Mr. Duerson's criminal history;

(2)     her withholding of her concerns about Mr. Duerson from her September 7, 2010, June 13, 2011, and August 25, 2011 reports to the juvenile court for fear of being fired;

(3)     her awareness of and failure to investigate evidence of potential abuse, including T.D.'s report that Mr. Duerson had hit him with a wooden mop and school officials' reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father; and

(4)     her responsibility for T.D. being placed and remaining in Mr. Duerson's home.

Ms. Patton's conduct significantly exceeded "ordinary negligence" or "permitting unreasonable risks" and rose to "a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Ruiz*, 299 F.3d at 1184 (quotations omitted); *see also Currier*, 242 F.3d at 919-20 (determining that Mr. Doran's parallel conduct to Ms. Patton's was conscience shocking) (discussed more below).

*    *    *    *

In sum, Ms. Patton's conduct violated T.D.'s substantive due process right by creating or increasing T.D.'s vulnerability to the danger of private violence by Mr. Duerson.

2. **Clearly Established Law**

Under *Currier*, T.D. suffered a constitutional violation of a right that was clearly established. As previously discussed, to show clearly established law, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. at 551 (quotations omitted). Although there need not be a "case directly on point," *id.*, "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it." *Sheehan*, 135 S. Ct. at 1774 (brackets and quotations omitted).

Our decision in *Currier* meets those exacting standards. Based on the parallel facts of *Currier* and the law established in that case, a reasonable official in Ms. Patton's shoes would have understood that she was violating T.D.'s constitutional right by creating or increasing T.D.'s vulnerability to the danger posed by Mr. Duerson. *Sheehan*, 135 S. Ct. at 1774. Ms. Patton's attempts to distinguish *Currier* are unavailing.

a. *Parallels to Currier*

*Currier* and this case are factually and legally on point. Both involved county social workers removing a child (children in *Currier*) from a mother and then recommending the child be placed in the father's home, where the child was abused

by the father. Both cases also involved members of the same limited and specifically definable group—"children the state has removed from their natural parent and taken into state custody." *Currier*, 242 F.3d at 920. These parallels and additional facts in *Currier* define "beyond debate" T.D.'s substantive due process right to be free from a state-created danger. *White*, 137 S. Ct. at 551; *Sheehan*, 135 S. Ct. at 1174.

First, in *Currier*, Mr. Doran (1) failed to investigate evidence of potential abuse, including bruises on the children, general allegations of abuse, and a "very specific accusation" of abuse and (2) recommended to the court that Mr. Vargas assume legal custody. 242 F.3d at 919. Those facts supported *Currier*'s conclusions that Mr. Doran (1) created or increased the children's vulnerability to the danger, (2) placed the children at an obvious risk of serious, immediate, and proximate harm, and (3) recklessly and consciously disregarded that risk. *Id.* at 920.

Like Mr. Doran, Ms. Patton (1) failed to investigate evidence of abuse, including a "very specific" report of abuse (e.g., T.D.'s wooden mop report) and other indicia of abuse (e.g., T.D.'s complaints to school nurses of body aches and fear of Mr. Duerson), and (2) recommended to the juvenile court that Mr. Duerson receive and keep temporary custody of T.D. Accordingly, based on the facts of *Currier*, a reasonable official in Ms. Patton's shoes would have understood that she (1) created or increased T.D.'s vulnerability to the danger, (2) placed T.D. at an

- 43 -

obvious risk of serious, immediate, and proximate harm, and (3) recklessly and consciously disregarded that risk. *Id.*[22]

Second, in *Currier*, Mr. Doran withheld from the juvenile court facts undermining the fitness of Mr. Vargas as a caretaker—specifically, his history of not paying child support—and contributed to this court's determination that he was responsible for the children's placement with Mr. Vargas. *Id.* at 919. *Currier* therefore put Ms. Patton on notice that she, too, could be held responsible for placing T.D. in danger by withholding from the juvenile court facts undermining Mr. Duerson's fitness as a caretaker—specifically, certain information regarding his criminal history.

Third, *Currier* found Mr. Doran's conduct to be conscience shocking in light of:

(1)    his withholding of information about Mr. Vargas's failure to pay child support;

(2)    his awareness of and failure to investigate potential abuse, including the numerous bruises on the children explained as caused by bunk bed falls and allegations Mr. Vargas was abusing the children; and

(3)    his responsibility for the juvenile court's granting Mr. Vargas legal custody.

*Id.* at 920. Ms. Patton's conduct closely resembles Mr. Doran's in light of:

---

[22] We recognize *Currier* addressed Mr. Doran's conduct after physical—but before legal—custody was granted to Mr. Vargas, and here we are considering Ms. Patton's conduct both before and after legal and physical custody was awarded to Mr. Duerson. But, as discussed below, the timing of custody was not the critical factor in *Currier* to determine the scope of relevant conduct. Instead, we looked to whether and when there were "affirmative actions" taken to create the danger.

(1) her withholding of certain information about Mr. Duerson's criminal history;

(2) her awareness of and failure to investigate evidence of potential abuse, including T.D.'s report that Mr. Duerson had hit him with a wooden mop and school officials' reports that he had spent significant time in the school nurse's office complaining of body aches and appearing fearful of his father; and

(3) her responsibility for T.D.'s being placed and remaining in Mr. Duerson's home.

As noted above, Ms. Patton also withheld her concerns about Mr. Duerson from her September 7, 2010, June 13, 2011, and August 25, 2011 reports to the juvenile court for fear of being fired. Based on the foregoing, a reasonable official in Ms. Patton's position would have understood that her conduct was a constitutional violation.

b. *Ms. Patton's arguments*

Ms. Patton attempts to show *Currier* does not provide clearly established law. She first argues *Currier* forecloses using her post-placement conduct to support a constitutional violation.[23] Her remaining arguments attempt to distinguish *Currier*.[24] Ms. Patton does not persuade us that she is entitled to qualified immunity for lack of clearly established law.

---

[23] We regard this argument as more appropriately directed to whether there was a constitutional violation, but we nonetheless address it here because Ms. Patton has presented it as a prong-two argument.

[24] Ms. Patton also points out that we reviewed a motion to dismiss the claim in *Currier* under the notice-pleading standard of *Conley v. Gibson*, 355 U.S. 41 (1957), rather than the more particularized requirements of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). Aplt. Br. at 37 n.6. But Ms. Patton does not argue or explain how that may affect whether *Currier* provides clearly established law.

- 45 -

###### i. Post-custody conduct

Ms. Patton first argues *Currier* held that "post-custody conduct" was not relevant to the danger-creation analysis for Mr. Doran, so her own post-placement conduct after the November 3, 2010 placement is also irrelevant. Aplt. Br. at 48-49 (citing *Currier*, 242 F.3d at 919-20). This argument misinterprets *Currier*.

In *Currier*, this court recognized that, during the time the defendant official engaged in conduct that affirmatively contributed to danger creation, all of the defendant's conduct tending to do so—including a failure to investigate—is relevant. Relevance turns not on when the custody placement occurred but when the defendant's affirmative danger-creating conduct occurred. Our analysis in *Currier* made this clear. We considered Mr. Doran's recommendation that Mr. Vargas should have legal custody of his children to be relevant even though Mr. Vargas had already assumed physical (though not legal custody) of the children. *Currier*, 242 F.3d at 919. Further, we did not consider Mr. Doran's failure to investigate abuse of the children after Mr. Vargas received legal custody to be relevant, not because the legal custody decision had been made, but because the panel said Mr. Doran was not at that time engaging in affirmative conduct to put the children in danger, such as recommending to the juvenile court that the children remain with Mr. Vargas. *Id.* at 909, 919. Finally, we considered Ms. Medina's instructing the children's mother to remain silent about the father's alleged abuse to be relevant even though she did so after Mr. Vargas obtained legal custody. *Id.* at 921. In short, conduct relevant to

danger creation depends on affirmative conduct, which can occur before and after a parent obtains legal custody of a child.

Under *Currier*, T.D.'s placement in Mr. Duerson's home on November 3, 2010, did not determine what conduct was relevant to T.D.'s danger-creation claim. Rather, *Currier* shows the relevant inquiry is whether Ms. Patton took affirmative actions after that date. Ms. Patton, similarly to Ms. Medina in *Currier*, took affirmative actions after November 3, 2010, by recommending four times that T.D. remain in Mr. Duerson's temporary physical and legal custody. Those affirmative actions made her post-placement conduct, including her failure to investigate evidence of potential abuse, relevant to analyze T.D.'s danger-creation claim.

### ii. Attempts to distinguish *Currier*

Ms. Patton's attempts to distinguish *Currier* on four grounds all fail.

#### 1) Same children

Ms. Patton argues the "dispositive distinction" between *Currier* and this case is that in *Currier* the past allegations of child abuse that occurred before custody was granted to the father concerned the same children who were placed in Mr. Vargas's custody. Oral Arg. at 3:12-28. Ms. Patton contends she was never "alerted to *any* abuse of T.D. by [Mr. Duerson] before custody was transferred to [him]." Aplt. Br. at 42, 50 (bold omitted); Oral Arg. 3:24-3:48. This argument fails for two reasons.

First, what matters most is not the identity of the victims, but that the social workers in both cases had evidence of child abuse by the fathers before making their custody recommendations, and thus had notice the fathers' homes would be dangerous

places.  In *Currier*, Mr. Doran had notice, based on the allegations that Mr. Vargas had abused the children after assuming physical custody of them, that Mr. Vargas's home would continue to be a place of danger if the father were granted legal custody. *See Currier*, 242 F.3d at 919-20.  He nevertheless recommended Mr. Vargas be awarded legal custody of the children.  *Id.* at 919.

Here, Mr. Duerson's abuse of P.G.—his step-child under his care—gave Ms. Patton notice that Mr. Duerson's home would be a place of danger for T.D.  *See* Dist. Ct. Order at 36 (explaining the record supported that Ms. Patton was on notice that Mr. Duerson might "re-offend against another child in his care").  By intentionally omitting from her report to the juvenile court her concerns and details of Mr. Duerson's criminal history—including her knowledge that there were "multiple other incidents" of Mr. Duerson abusing P.G.—Ms. Patton's own actions reflect she knew the information she excluded was important to the court's placement decision. Compared to Mr. Doran, Ms. Patton had even stronger evidence that Mr. Duerson was a child abuser.  But she nonetheless recommended that a child be placed in a convicted child abuser's home.

Second, just as Mr. Doran recommended in *Currier* that Mr. Vargas's children should live with him even though he had previously abused them, Ms. Patton, after learning about Mr. Duerson's abuse of T.D., recommended that T.D. should stay with his father.  The juvenile court followed those recommendations, leaving T.D. in the home and enabling the father to abuse him on multiple occasions.

- 48 -

Combined with her pre-placement conduct, her post-placement conduct makes this case even stronger than *Currier* for a danger-creation violation. In *Currier*, once Mr. Doran knew that Mr. Vargas had abused his children after receiving physical (but not legal) custody of them, Mr. Doran's single recommendation supporting Mr. Vargas's legal custody of those children contributed to a constitutional violation. *Currier* thus clearly established that, once Ms. Patton knew that Mr. Duerson had abused T.D. in his home, her recommendations that T.D. should remain in Mr. Duerson's temporary custody also led to a constitutional violation.[25] In sum, her pre- and post-placement conduct together supports a clear *Currier* violation.

### 2) "Team" process

Ms. Patton raises two related arguments about a "team" process in placing T.D. with Mr. Duerson. Both fail.

First, she questions whether she could be liable when other "team" members also supported T.D.'s placement with his father. *See, e.g.*, Aplt. Br. at 46 (arguing that Ms. Patton's failure to disclose information to other individuals "does not establish a constitutional violation"). Whether more properly viewed as a prong-one

---

[25] At oral argument, Ms. Patton's lawyer attempted to argue that her notice of Mr. Duerson's physically abusing T.D. did not give her notice he would sexually abuse T.D. Apart from being improperly raised for the first time at oral argument, *see EEOC v. TriCore Reference Labs*, 849 F.3d 929, 941 n.13 (10th Cir. 2017), this argument lacks merit. A home where the caretaker abuses a child is a place of danger—whatever form that abuse takes. In any event, Mr. Duerson had both physically and sexually abused P.G.—putting Ms. Patton on notice that he could do either or both to T.D.

constitutional violation argument or a prong-two clearly established law argument, it lacks merit.

She identifies the "team" as including Ms. Gomez (T.D.'s guardian ad litem), T.D.'s parents, and the attendees at the August 17, 2010 meeting, including T.D., Briana Hutchinson (an outside family therapist), and Kyle Hommes (T.D.'s clinician at Shiloh House). But Ms. Patton was the DDHS case worker who made the recommendation at the September 7, 2010 hearing and who withheld her knowledge and concerns about the placement from the final report submitted to the juvenile court. And apart from Ms. Patton, the only "team" member who participated at the September 7, 2010 hearing was Ms. Gomez, with whom Ms. Patton failed to share the full extent of her knowledge of Mr. Duerson's history or her concerns about T.D.'s placement with him, including details of Mr. Duerson's 2005 conviction documented in the Trails Report. Ms. Gomez testified that she would "probably" have changed her placement recommendation had Ms. Patton shared these details with her because they would have corrected her misconception about the nature of the 2005 conviction.[26] Dist. Ct. Order at 11 (brackets omitted). Ms. Patton also cannot shift blame to other "team" members when she failed to disclose to them the

---

[26] Ms. Patton asserts other "team" members had access to the information she knew, or could have requested that information. For instance, she argues that "[i]t is at least 'likely'" Ms. Gomez looked up Mr. Duerson's past criminal history in a state database, Aplt. Br. at 47, but, even if that were so, it would not compensate for her lack of knowledge of the Trails Report—a different document than Mr. Duerson's criminal history report.

full extent of her knowledge about Mr. Duerson's criminal history or her concerns about T.D.'s placement in his home.[27]

Second, she argues "there is no indication Do[r]an was part of a team decision-making process" in *Currier*. Aplt. Br. at 42-43. But Ms. Patton is incorrect that *Currier* lacked any "team" process in placing the children. In *Currier*, four CYF social workers worked together to place the children in Mr. Vargas's custody. The children's guardian ad litem and mother also were involved in the children's placement. *See* 242 F.3d at 908-10. And despite the involvement of a group in *Currier*, this court held the social workers could be held individually responsible for a danger-creation claim. *See id.* at 920 (Mr. Doran), 921 (Ms. Medina), 923 (Ms. Gonzales). Ms. Patton's "team" process argument does not dilute *Currier* as clearly established law.

### 3) Supervisor's direction

Ms. Patton next attempts to distinguish *Currier* because Mr. Doran's supervisor, Ms. Gonzales, did not direct him to recommend custody, whereas Ms. Patton's supervisor, Ms. Ketema, instructed her to do so.

We do not see why this matters for a danger-creation claim based on *Currier*. *Currier* establishes that the requisite mental state for a danger-creation claim is

---

[27] As noted above, her particular knowledge included details of Mr. Duerson's criminal offense against P.G., and her concerns included the reasons for his 2007 probation revocation (e.g., his purposeful failure to fulfill his sex offender treatment obligations). Although it is disputed to what extent Ms. Patton misrepresented her knowledge of Mr. Duerson's criminal history or shared her concerns with the meeting's attendees, we must view the facts in the light most favorable to T.D.

whether Ms. Patton "acted recklessly in conscious disregard" of a risk that was "obvious or known." 242 F.3d at 918. Ms. Patton's reasons for deleting parts of her initial report to the juvenile court that outlined her concerns about T.D.'s placement with Mr. Duerson (i.e., to avoid being fired) support that she knew of the danger posed to T.D. in Mr. Duerson's home and that she consciously disregarded that risk.

Nor does *Currier* allow her to escape liability due to her supervisor's misconduct. In *Currier*, we held that Mr. Doran's supervisor, Ms. Gonzales, could also be liable for unconstitutional conduct by knowingly failing to correct Mr. Doran's and Ms. Medina's unconstitutional behavior. *Id.* at 922-23. The actions of Mr. Doran's supervisor did not absolve Mr. Doran of liability. This same is so with Ms. Patton and Ms. Ketema.

### 4) Failure to provide criminal record

Ms. Patton argues *Currier* does not support a danger-creation claim "premised on the failure to provide a juvenile court with a complete criminal history where the court is aware of the only conviction in that history." Aplt. Br. at 45. This argument overlooks the relevant facts in *Currier*, where Mr. Doran was held responsible for a placement decision in part because he failed to disclose relevant information regarding Mr. Vargas's fitness as a caregiver—his failure to pay child support. Similarly, and even stronger here, Ms. Patton failed to disclose relevant information regarding Mr. Duerson's fitness—the details regarding Mr. Duerson's criminal conviction for abusing a child in his care, "multiple" other incidents of child abuse,

and other facts supporting he was not only unfit to care for T.D., but also posed a danger of private violence to T.D.

*    *    *    *

Ms. Patton fails in her attempts to argue *Currier* does not provide clearly established law. *Currier* did more than establish T.D.'s substantive due process rights "at a high level of generality." *White*, 137 S. Ct. at 552 (quotations omitted).[28] It is a "case where an offic[ial] acting under similar circumstances . . . was held to have violated" the Constitution. *Id.* The law and facts of *Currier* put a reasonable

---

[28] On August 16, 2017, counsel for Ms. Patton submitted a letter under Fed. R. App. P. 28(j), advising the circuit clerk of this court's decision in *Dahn v. Amedei*, No. 16-1059, 2017 WL 3470142 (10th Cir. Aug. 14, 2017), and stating it is germane to Ms. Patton's argument that "the District Court addressed the clearly established law inquiry at too high a level of generality."

In *Dahn*, a foster child had relocated from Oklahoma to Colorado, where a private adoption agency placed him for adoption with a foster father who abused him before and after the adoption was approved. Oklahoma had custody of the child until the adoption. *Id.* at *1, *6. The lawsuit alleged that county caseworkers in Colorado had violated the child's right to substantive due process for their failure to respond adequately to reports of abuse while the child was living with the father before the adoption. The caseworkers moved to dismiss, arguing they were entitled to qualified immunity.

The district court denied the motion, concluding the caseworkers had a special relationship with the child under clearly established law. It relied on *Schwartz v. Booker*, 702 F.3d 573 (10th Cir. 2012), for clearly established law. *Dahn* at *6. *Schwartz* held that the special-relationship doctrine applies not only to county employees who had placed a child in foster care but also to employees in another county who were responsible for investigating reports of abuse to the child, noting the placement made the child dependent on the state and all its county departments. *Id.* at 581-85.

We reversed in *Dahn*, holding that *Schwartz* did not clearly establish extension of "the special-relationship doctrine across state lines as well as county lines." *Dahn* at *7.

*Dahn* does not support Ms. Patton's generality argument here. *Dahn* concerns the special-relationship doctrine; this case concerns the danger-creation doctrine. Moreover, as our analysis shows, the district court did not extend the law that was clearly established in *Currier*, this case and *Currier* are factually parallel, and this case presents an even stronger foundation than *Currier* for a danger-creation claim.

- 53 -

person in Ms. Patton's circumstances on notice that her conduct regarding T.D.'s placement was unconstitutional. *Id.* at 551.

## III.  **CONCLUSION**

We affirm the district court's denial of summary judgment.

No. 16-1092, T.D. v. Patton and The Denver Dep't of Human Servs.,

**BRISCOE**, Circuit Judge, concurring.


I agree that we are bound by our prior ruling in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001). However, I believe Currier was wrongly decided because it directly conflicts with the Supreme Court's precedent in DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189 (1989). In addition, to the extent the Court in DeShaney left the door open for an exception based on a state-created danger, the test the Tenth Circuit has devised for that exception has been applied too broadly. Our precedent should be reconsidered in an appropriate case.

## I

In DeShaney, the Supreme Court held that social workers were not constitutionally liable for failing to protect Joshua Deshaney from his father, Randy DeShaney. DeShaney, 489 U.S. at 191. Authorities first learned that Joshua might be endangered when DeShaney's second wife complained to police that DeShaney had hit Joshua, causing marks. Id. at 192. "The Winnebago County Department of Social Services (DSS) interviewed [DeShaney], but he denied the accusations, and DSS did not pursue them further." Id. A year later, Joshua was admitted to a local hospital with "multiple bruises and abrasions," and the examining physician notified DSS of suspected child abuse. Id. DSS "immediately obtained an order from a Wisconsin juvenile court placing Joshua in the temporary custody of the hospital." Id.

The county then convened a "'Child Protection Team' — consisting of a pediatrician, a psychologist, a police detective, the county's lawyer, several DSS caseworkers, and various hospital personnel — to consider Joshua's situation." Id. The Team decided that "there was insufficient evidence of child abuse to retain Joshua in the custody of the court," but did "recommend several measures to protect Joshua, including enrolling him in a preschool program, providing his father with certain counseling services, and encouraging his father's girlfriend to move out of the home." Id. DeShaney promised to cooperate with these recommendations. Id. "Based on the recommendation of the Child Protection Team, the juvenile court dismissed the child protection case and returned Joshua to the custody of his father." Id.

Following this incident, a DSS caseworker visited the DeShaney home monthly. "[S]he observed a number of suspicious injuries on Joshua's head; she also noticed that he had not been enrolled in school, and that the girlfriend had not moved out." Id. at 192–93. She recorded these observations, "along with her continuing suspicions that someone in the DeShaney household was physically abusing Joshua." Id. at 193. During this time, the case worker also received two more reports from emergency room personnel that Joshua had been treated for suspicious injuries. Id. at 192–93. The second of these reports was in November 1983. Id. at 193. On the caseworker's next two monthly visits to the DeShaney home, she was told that Joshua was too ill to see her. Id. In March 1984, DeShaney beat Joshua so severely that Joshua suffered permanent brain damage. Id. "DeShaney was subsequently tried and convicted of child abuse." Id.

2

Joshua and his mother brought § 1983 claims against the County and DSS employees alleging that the defendants "had deprived Joshua of his liberty without due process of law, in violation of his rights under the Fourteenth Amendment, by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." Id. at 193. They claimed that a "special relationship" existed between Joshua and the State "because the State knew that Joshua faced a special danger of abuse at his father's hands, and specifically proclaimed, by word and by deed, its intention to protect him against that danger." Id. at 197 (quoting Brief for Petitioners at 13–20, DeShaney, 489 U.S. 189, (No. 87-154), 1987 WL 880157). Specifically, as is most relevant here, the DeShaney plaintiffs asserted in their briefing that the county had violated Joshua's due process rights because, *inter alia*, it "*handed him back* to his abusing father and the father's abusing girlfriend." Brief for Petitioners at 5 (emphasis added).

The Supreme Court began by discussing the scope of substantive due process claims. "The Due Process Clause of the Fourteenth Amendment provides that '[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law.'" Deshaney, 489 U.S. at 194. This Clause "does not transform every tort committed by a state actor into a constitutional violation." Id. at 202. Rather, it "was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression.'" Id. at 196 (quoting Davidson v. Cannon, 474 U.S. 344, 348 (1986)). It is "a limitation on the State's power to act," not "a guarantee of certain minimal levels of safety and

3

security." Id. at 195. In other words, "[i]ts purpose was to protect the people from the State, not to ensure that the State protected them from each other." Id. at 196. "[T]he Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

The Court recognized that "in certain *limited circumstances* the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." Id. at 198 (emphasis added). Specifically, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199–200. In such a case, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. at 200. The conduct alleged in DeShaney did not meet this standard. Id. at 199–200 & 200 n.9. The Court held that there was no special relationship between Joshua and the State, because the State had not "by the affirmative exercise of its power so restrain[ed] [Joshua's] liberty that it render[ed] him unable to care for himself." Id. at 200. The Court stated further that the State's assumption of temporary custody over Joshua did not change the analysis because "the State does not become the permanent

4

guarantor of an individual's safety by having once offered him shelter." Id. at 201.

In its analysis, the Court also stated that the State's conduct, including returning Joshua to his father, did not create a danger to Joshua or increase his vulnerability to danger. Id. at 201. It wrote, "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played *no part* in their creation, nor did it *do anything* to render him any more vulnerable to them." Id. (emphasis added). Again, the State's temporary assumption of custody of Joshua did not alter this analysis because returning Joshua to his father's custody "placed him in no worse position than that in which he would have been had [the State] not acted at all." Id. Thus, the Court's opinion in DeShaney addressed both the special relationship exception and the state created danger exception and concluded that neither created an affirmative constitutional duty on the part of the state to protect Joshua. Id. Because "the State had no constitutional duty to protect Joshua against his father's violence, its failure to do so — though calamitous in hindsight — simply d[id] not constitute a violation of the Due Process Clause." Id. at 202.

Despite this clear statement in DeShaney, we held in Currier that social workers are constitutionally liable for harms inflicted upon children if the social worker was "responsible for" the court's decision to authorize the custody arrangement in which the child was later harmed. Currier, 242 F.3d at 919–20. We attempted to avoid the controlling precedent in DeShaney by drawing a distinction that returning a child to the same parent did not increase the child's vulnerability to danger from violence at the hands

5

of that parent, but returning a child to a different parent did.  Id. at 918.

The plaintiffs in Currier, as representatives of the children Latasha and Anthony, brought § 1983 claims against, among others, Tom Doran, a social worker for the Children, Youth, and Families Department of the State of New Mexico (CYF), alleging that Doran had "violated their fundamental rights under the Fourteenth Amendment of the United States Constitution."  Id. at 908.  The facts relevant to the issue in DeShaney, presented in the light most favorable to the Currier plaintiffs, are as follows.

On April 30, 1993, CYF investigated a report of neglect regarding Latasha and Anthony, who were, at the time, in the custody of their mother, Devonne Juarez.  Id. at 909.  A CYF worker found Latasha and Anthony, both under the age of four at the time, in the care of their five-year-old cousin.  Id.  Juarez had left the state.  Id.

CYF petitioned the Children's Court for an order formally transferring legal custody of Latasha and Anthony to CYF.  Id.  A hearing regarding this petition was held on May 10, 1993.  Id.  As of this hearing, Doran had learned that the children's father, Vargas, had a "history of financial irresponsibility" and had made only eight child support payments in the previous three years.  Id.  Doran attended the Children's Court hearing, but did not say anything about Vargas's failure to pay child support.  Id.  The Children's Court granted legal custody of the children to CYF, but physical custody to Vargas.  Id.

On July 22, 1993, Doran visited Vargas's home and noticed a small bruise on Anthony's cheek, which Vargas's girlfriend attributed to a fall on the playground.  Id.  On August 3, 1993, Anthony had another bruise when he arrived at CYF for an office visit.

6

Id. This bruise was also attributed to a fall. Id. Juarez reported in both August and September that Vargas was physically abusing the children. Id. Doran was aware of at least one of these reports but did not investigate. Id. Also in August 1993, Juarez alleged that Vargas's fiancée punished the children by dunking them in a bathtub full of water. Id. Again, Doran was aware of this allegation but did not investigate. Id. On October 15, 1993, the children came to CYF for an office visit. Latasha had two visible bruises on her back. When asked who gave them to her, she replied "Da Da." Id. at 910.

On October 19, 1993, legal custody was transferred to Vargas. Id. at 909. On April 16, 1994, Vargas poured boiling water on Anthony. Id. Anthony later died from his injuries. Id. This court affirmed the denial of qualified immunity to Doran under a state-created danger theory. Id. at 919.

## II

As a factual matter, I cannot square Currier with DeShaney. I am not persuaded by our purported distinction between a state that assumes custody of a child from a parent and then returns that child to the same parent and a state that assumes custody of a child and then returns that child to a different parent. In both cases the state makes an affirmative recommendation regarding the placement of the child. And, in DeShaney, this purportedly affirmative conduct was not adequate to implicate substantive due process concerns. DeShaney, 489 U.S. at 201. Therefore, assuming *arguendo* that the state-created danger theory of substantive due process violations is a valid theory of liability in some circumstances, then either the conduct alleged in Currier does not meet

7

the Tenth Circuit's test, or that test sets the bar too low.

Under our test, to establish a claim under the danger-creation theory, a plaintiff must show: (1) "that the state actor engaged in affirmative conduct"; (2) "that there was private violence"; (3) that the state actor "created the danger or increased plaintiff's vulnerability to the danger in some way"; (4) that "plaintiff was a member of a limited and specifically definable group"; (5) that the state actor's "conduct put plaintiff at substantial risk of serious, immediate, and proximate harm"; (6) that "the risk was obvious or known"; (7) that the state actor "acted recklessly in conscious disregard of that risk"; and (8) that "such conduct, when viewed in total, is conscience shocking."[1] Estate of B.I.C. v. Gillen, 761 F.3d 1099, 1105 (10th Cir. 2014) (quoting Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013)). Although I doubt that Doran's conduct meets several of these elements, I focus here on the first, affirmative conduct.

With respect to this element, we held in Currier that Doran "was responsible for the Children's Court's decision to grant Vargas legal custody, through *either* his failure to investigate and report to the court or through his affirmative recommendation." Currier, 242 F.3d at 919 (emphasis added). The factual basis for this conclusion was that Doran failed to tell the Children's Court about Vargas's history of financial irresponsibility,

---

[1] We have referred to these first two elements as "preconditions" that must be met before a plaintiff may allege a substantive due process claim premised on a theory of state-created danger. Estate of B.I.C. v. Gillen, 761 F.3d 1099, 1105 (10th Cir. 2014); Gray v. Univ. of Colo. Hosp. Auth., 672 F.3d 909, 920 n.8 (10th Cir. 2012) (recognizing that the omission of these two preconditions from the six-factor test had "generate[d] oversight on the part of courts and counsel alike," because these preconditions are necessary to invoke the state-created danger theory).

failed to further investigate bruises after Vargas and his fiancée offered an explanation, and failed to investigate Juarez's allegation that Vargas's fiancée had punished the children by dunking them in a bathtub full of water.  Id.  Notably, these are all omissions, not affirmative acts.  We then stated that "Doran 'created the danger or increased the plaintiff[s'] vulnerability to the danger' through his *failure to investigate* the numerous bruises and allegations of abuse and his *responsibility for* the court order granting legal custody to Vargas."  Id. at 919–20 (emphasis added).  In a footnote, we elaborated:

> It is true that the conduct Plaintiffs complain of is partially a failure by Doran to act on particular allegations of abuse.  Doran's failure to investigate allegations of abuse while the children were in state legal custody should be distinguished, however, from a claim that the state failed to rescue the children once legal custody was given to Vargas.  Doran's failure to investigate allegations of abuse should be viewed in the general context of the state's affirmative conduct in removing the children from their mother and placing the children with their father.

Id. at 920 n.7.

As a general matter, I find it hard to conclude that a social worker can be "responsible for" the independent decision of a judge who ultimately orders a change of custody.  But, even if we assume such responsibility exists, we cannot transform omissions or failures to act into affirmative conduct merely by considering them "in the general context of" a custody recommendation.  The only affirmative act that could be found in Currier is the recommendation itself, which, in my view is no different from the affirmative recommendation in DeShaney that Joshua be returned to his father's custody.

If constitutional liability attaches to such a recommendation, any future harm that

9

befalls a child in the recommended placement could be the basis for a substantive due process claim against the social worker. This rule makes the state the permanent guarantor of a child's safety. The Supreme Court has told us that substantive due process does not reach so far. DeShaney, 489 U.S. at 201. Either a custody recommendation is not the type of affirmative conduct that can support a substantive due process violation under our test for a state-created danger theory of liability, in which case Currier was wrongly decided on the facts; or our test for the state-created danger theory conflicts with the Supreme Court's decision in DeShaney, by imposing liability for acts that do not violate the Due Process Clause of the Constitution.